**CONSERVATION COUNCIL OF NORTH CAROLINA et al., Plaintiffs,**

**v.**

**Robert F. FROEHLKE, Secretary of the Army, et al., Defendants,**

**The City of Fayetteville, a municipal corporation, and Cumberland County, a political subdivision of the State of North Carolina, et al., Intervenors.**

**No. C–184–D–71.**

United States District Court,
M. D. North Carolina,
Durham Division.

Feb. 14, 1972.

fortunate death occurred before he issued his ruling on the motion.

To prevent having to recall witnesses and go through a second evidentiary hearing, the parties stipulated that a ruling on the motion could be made from the record before the Court. Because of the importance of this matter, and desiring to be fully informed, the Court held a hearing for presentation of oral arguments by counsel on February 7, 1972, preliminary to issuing an opinion and order.

Norman B. Smith, Greensboro, N. C., for plaintiffs.

William L. Osteen, U. S. Atty., Greensboro, N. C., for defendants Robert F. Froehlke, Secretary of the Army, and others; George M. McDermott, Sanford, N. C., for additional defendant Sanford Construction Company; Rudolph G. Singleton, Jr., Fayetteville, N. C., for intervenors City of Fayetteville, and others; Joseph B. Chandler, Jr., Elizabethtown, N. C., for intervenors Town of Elizabethtown, and others; James C. Fox, Wilmington, N. C., for intervenors City of Wilmington, and others; Wiley F. Bowen, Dunn, N. C., for intervenors City of Dunn, and others; Lowry Betts, Sanford, N. C., for intervenor City of Sanford; Claude V. Jones, Durham, N. C., for intervenor City of Durham; Emery B. Denny, Jr., Chapel Hill, N. C., for intervenor Town of Chapel Hill.

## MEMORANDUM ORDER

GORDON, Chief Judge.

The above-named plaintiffs brought this action on August 10, 1971, seeking injunctive and declaratory relief against the construction of the New Hope Dam by the United States Army Corps of Engineers. On December 2, 1971, the matter came on for hearing on plaintiffs' motion for a preliminary injunction before Judge Edwin M. Stanley, Chief Judge of the Middle District of North Carolina. However, Judge Stanley's un-

## FACTS

The New Hope Lake project lies near the central eastern edge of the North Carolina Piedmont Plateau. The project area includes portions of four central North Carolina counties—Chatham, Durham, Orange, and Wake. The impounded water will cover a surface area of 14,300 acres and will come from two primary sources, the Haw River and the New Hope River. The Haw River is a swiftly moving river with a narrow valley and a steep stream gradient. The New Hope River, the largest tributary of the Haw River, is a slow-moving river with a comparatively wide flood plain and a gentle stream gradient. It joins the Haw River three-tenths (0.3) of a mile above the dam site. Due to the difference in stream gradients, ninety (90) percent of the impoundment will be in the New Hope basin but will be primarily from the more swiftly flowing Haw River.

On December 30, 1963, Congress enacted Public Law 88–253 authorizing funds for a multipurpose dam for flood control, water supply, water quality control, general recreation, and fish and wildlife enhancement. Groundbreaking for the actual construction of the dam occurred on December 7, 1970. As of September, 1971, about fifty-four (54) percent of the land required for the project has been acquired and the dam construction is twenty-two percent complete. The total cost as of September, 1971, is approximately $16.9 million.

The plaintiffs are seeking an injunction to halt further construction because of the harm they feel is being done to the environment in the project area and because of the alleged poor water quality that will be impounded by the project. The plaintiffs contend that an injunction is proper because of alleged violations of the National Environmental Policy Act of 1969 (hereinafter referred to as NEPA), 42 U.S.C. § 4331 et seq. (1970).

## DISCUSSION

Even though NEPA did not become effective until January 1, 1970, the defendants concede that the New Hope Dam Project must still comply with NEPA's requirements as to future action even though the dam was authorized seven years prior to NEPA's effective date. EDF v. Corps of Engineers, 325 F.Supp. 749 (E.D.Ark.1971).

The purpose of NEPA is to create a council which can review national policies and environmental problems. U. S. Code and Administrative News, 1969, Vol. 2, p. 2759. To achieve this purpose, all federal agencies are required by 42 U.S.C. § 4332 to (1) utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decision making which may have an impact on man's environment; (2) include a detailed statement for all major federal actions which significantly affect the environment. The detailed statement must contain the environmental impact of the proposed action, any adverse environmental effects and any alternatives to the proposed action.

Courts that have discussed these requirements have consistently held that these requirements provide only procedural remedies instead of substantive rights, and the function of the court is to insure that the requirements are met. Therefore the Court cannot substitute its opinion as to whether the project should be undertaken or not. Committee

for Nuclear Responsibility v. Seaborg, Slip Opinion No. 71–1732 (D.C.Cir. Oct. 5, 1971).

In EDF v. Hardin, 325 F.Supp. 1401 (D.D.C. 1971), the plaintiffs were seeking to prevent the spraying of insecticide by the Department of Agriculture to reduce the fire ant population. Before ruling on the findings of fact, the court stated at p. 1404,

"Thus in reviewing the Department of Agriculture program under consideration here, the Court will not substitute its judgment for that of the Secretary on the merits of the proposed program but will require that the Secretary comply with the procedural requirements of the National Environmental Policy Act as outlined above."

EDF v. Corps of Engineers, *supra,* involves a fact situation that is identical to the case before this Court. The plaintiffs were seeking an injunction to prevent the Corps of Engineers from building the Gillham Dam Project on the Cossatot River in Arkansas. The plaintiffs were successful in obtaining a temporary injunction but only because the Corps of Engineers had not followed the procedural requirements of NEPA. The Court expressly rejected the contention that NEPA gave the plaintiffs any substantive rights and instead characterized NEPA as being "an environmental full disclosure law."

"The 'detailed statement' required by § 102(2) (C) [42 U.S.C. 4332(2) (C)] should, at a minimum, contain such information as will alert the President, the Council on Environmental Quality, the public, and, indeed, the Congress, to all known possible environmental consequences of proposed agency action. * * * The record should be complete. Then, if the decisionmakers choose to ignore such factors, they will be doing so with their eyes wide open." 325 F.Supp. at 759.

[3, 4] The cases clearly indicate that the function of this Court in the instant case is limited to a determination of whether the defendants have complied with all of the procedural requirements

of NEPA. If the defendants' environmental impact statement is a full disclosure of all possible environmental effects, then the Court must deny the plaintiffs' motion for a preliminary injunction and it will be the duty of the Council on Environmental Quality, the President, or Congress through its appropriation powers to rule on the advisability of continuing the project.

After reviewing the three volumes that comprise the environmental impact statement, the Court can hardly conceive of a statement that could better meet the requirement of disclosing "to the fullest extent possible" all environmental factors, assessing adverse environmental effects, and discussing alternatives to the proposed agency action. The primary reason that the impact statement meets the requirement of full disclosure is because the defendants included in the statement the depositions of plaintiffs' expert witnesses.

By including the actual depositions of the opposing experts, the decisionmakers can read of the alternatives, adverse effects, mistakes in calculation, and reasons that the dam should not be built in undiluted form. These experts give very damaging testimony as to future water quality of the New Hope Lake; they point out alleged discrepancies in the cost-benefit ratio as figured by the defendants; they question whether the project is really needed for flood control or water supply purposes; they fear a loss of air quality because of the cutting of timber land; and finally, they object to the aesthetic loss of a unique, natural area.

Much of this expert testimony conflicts with the conclusions reached by the Corps of Engineers, particularly in the area of water quality and the methods used to determine the cost-benefit ratio of the project. However, it is, clearly not the role of the Court to resolve these conflicting opinions.

"When, as here, the issue of procedure relates to the sufficiency of the presentation in the statement, the court is not to rule on the relative merits of competing scientific opinion. Its function is only to assure that the statement sets forth the opposing scientific views, and does not take the arbitrary and impermissible approach of completely omitting from the statement, and hence from the focus that the statement was intended to provide for the deciding officials, any reference whatever to the existence of responsible scientific opinions concerning possible adverse environmental effects." Committee for Nuclear Responsibility v. Seaborg, supra, p. 7.

In reviewing the plaintiffs' complaint and briefs, the Court has not found any allegation of the plaintiffs that has not been made a part of the environmental impact statement, either in the part drawn by the Corps of Engineers or the part comprising the plaintiffs' depositions. In presenting their oral arguments at the hearing, counsel for the plaintiffs discussed three areas in which they allege the impact statement is either wrong or has omitted some environmental consideration that should be made available to the decisionmakers.

Counsel for the plaintiffs first argued that the Corps of Engineers had greatly overestimated the benefits that are to be derived from the New Hope Project and therefore the cost-benefit ratio is greatly exaggerated. Each of the benefits that the plaintiffs contend that the defendants overestimated has already been discussed in the impact statement and therefore is subject to the scrutiny of the proper decisionmakers.

"It is for the Congress to determine, in authorizing such a project and in, thereafter, making subsequent appropriations therefor, whether the benefits are 'in excess of the estimated costs.' The Court does not believe that it has the authority to enjoin the expenditure of appropriated funds upon a showing that the benefits are less than the estimated cost. The plaintiffs and others are free to bring such matters to the attention of the legislative branch at the time any new

appropriation for this project is proposed. * * * The methods of calculating cost-benefit ratios are innumerable and in many cases esoteric. The Court's judgment as to sound procedures in this regard might well not be in accord with the judgment of Congress." EDF v. Corps of Engineers, 325 F.Supp. 728, 740 (E.D. Ark.1970).

The same result was reached in an earlier decision by the Court of Appeals for the Fourth Circuit in a case involving a West Virginia dam. The Court stated:

"So far as the benefit exceeding the cost is concerned, this was a matter of legislative policy, (cite omitted) and it has been determined by Congress in the express authorization of the project. . . . " United States v. West Virginia Power Co., 122 F.2d 733, 738 (4th Cir. 1941).

The plaintiffs next argued that the defendants have failed to comply with NEPA because of several important omissions in the impact statement. The plaintiffs contend that the Corps of Engineers in drafting the impact statement failed to consider what effect two future nuclear power plants that are to be constructed below the dam and which will consume large quantities of water daily will have on the New Hope Project. The plaintiffs also contend that the impact statement does not include a discussion of the effect of a proposed passage of Interstate Highway 40 through one of the project's conservation pools.

All three of the above-mentioned projects are relatively new projects. The proposed Interstate 40 Route is only one of six possible routes under consideration and is the only one that will come into contact with the New Hope Project. Apparently only one of the generating plants has begun actual construction. Since these projects have been developed subsequent to the New Hope Project their relationship with New Hope should be considered in the impact statement prepared for each of the new projects.

The final argument of the plaintiffs concerns the impact statement's consideration of possible alternatives to the project. The plaintiffs contend that the defendants did not give adequate consideration to possible alternatives as required by NEPA.

"NEPA requires that an agency must—to the *fullest* extent possible under its other statutory obligations —consider alternatives to its actions which would reduce environmental damage. That principle establishes that consideration of environmental matters must be more than a *pro forma* ritual." Calvert Cliffs' Coordinating Committee, Inc. et al. v. United States Atomic Energy Commission, 449 F.2d 1109, 1128 (D.C.Cir., 1971).

The plaintiffs point out that only seven pages of the environmental impact statement are devoted to the discussion and analysis of alternatives to the project. They, therefore, contend that the Corps of Engineers could not have examined these alternatives to the fullest extent possible. The Court feels otherwise.

In examining these seven pages, pages 33–39, the Court notes that exactly half of these seven pages are concerned with the two primary alternatives suggested by the plaintiffs, abandonment of the project and operation of the New Hope Dam as a dry dam. The remaining pages discuss a total of seven other alternatives that have been suggested at one time or another. The Court is of the opinion that in the discussion of each alternative, the impact statement presents practical reasons for going ahead with the New Hope Project rather than the suggested alternative and that further discussion of each alternative would be a useless act.

The Court is also of the opinion that the seven pages in the impact statement do not have to necessarily represent the Corps' complete analysis of the alternatives. 42 U.S.C. § 4332(2) (D) requires the agency to study, develop, and describe alternatives to a proposal

where there are unresolved conflicts concerning alternative uses of available resources, but 42 U.S.C. § 4332(2) (C), which is the section requiring the "detailed statement" or environmental impact statement, only requires that the agency include the alternatives to the proposed action in the statement. Therefore, the fact that the impact statement has only seven pages which discuss the alternatives to the project is not of itself controlling.

> "The agency need not set forth at full length views with which it disagrees, all that is required is a meaningful reference that identifies the problem at hand for the responsible official." Committee for Nuclear Responsibility, Inc., et al. v. Seaborg, *supra*, p. 8.

In EDF v. Corps of Engineers, *supra*, the impact statement was found deficient in several areas, including the discussion of alternatives. However in that case, the impact statement had completely omitted two primary alternatives and had not adequately considered several others. Such is not the case with the New Hope impact statement where all alternatives have been adequately set forth.

■■ In conclusion, this Court finds that even though the plaintiffs have presented strong evidence which casts doubt on the advisability of continuing with the New Hope Project, they have not shown that the defendants failed to comply with the requirements set out in NEPA. The role of this Court, and indeed all courts, is to require compliance with the law. What is best to be done along the environs of the New Hope and Haw Rivers is a judgment matter for Congress, and the Court must be careful not to substitute its judgment as to what is best. It is clear that NEPA was not intended to be a means for the Courts to second guess congressional appropriations, but was intended to be a means of disclosing to Congress and other decisionmakers all environmental factors in order that decisions and appro-

priations could be made with as little adverse effect on the environment as possible. The Court, therefore, finds that the Environmental Impact Statement sets forth the expected environmental effects of the New Hope project in sufficient detail to satisfy the disclosure requirements of NEPA.

In summary, the plaintiffs have not proven that they are likely to succeed in proving the allegations of the complaint in the final determination of this matter. Therefore, the motion of the plaintiffs for a preliminary injunction is denied.

It is so ordered.