**SIERRA CLUB et al., Plaintiffs,**

v.

**Robert F. FROEHLKE, Secretary of the Army, et al., Defendants,**
**and**
**Milan and Doris Slayback et al., Interveners.**

**No. 72–C–110.**

United States District Court, W. D. Wisconsin.

June 2, 1972.

4. Medical Report of Dr. Paul Roura, Tr. 78–79.

See also, D.C., 329 F.Supp. 890.

Frank M. Tuerkheimer, Madison, Wis., for plaintiffs.

John O. Olson, U. S. Atty., Madison, Wis., for defendants.

David E. Beckwith, Milwaukee, Wis., for interveners.

JAMES E. DOYLE, District Judge.

This is a civil suit seeking injunctive and declaratory relief to restrain defendants from opening bids for contracts, letting contracts, undertaking land purchases, site preparation, development, construction or other activities relating to the Kickapoo project, Kickapoo River, Wisconsin, which generally involves flood control and other measures proposed by the defendants for the Kickapoo River, Wisconsin. The suit arises under the Fifth and Ninth Amendments to the Constitution of the United States; The National Environmental Policy Act of 1969, 42 U.S.C. § 4321 et seq. (1970 Supp.) (hereinafter called "NEPA"); The Environmental Quality Improvement Act of 1970, 42 U.S.C. § 4371 et seq. (1970 Supp.); The Fish and Wildlife Coordination Act, 16 U.S.C. §§ 661–665 (1970); The Flood Control Act of 1962, §§ 201 and 203, 76 Stat. 1180 (1962); The Flood Control Act of 1936, 33 U.S.C. § 701a (1970); The Administrative Procedure Act, 5 U.S.C. § 701 et seq. (1970).

Jurisdiction is alleged under 5 U.S.C. § 702 and 28 U.S.C. §§ 1331(a), 1337, 2201 and 2202. The amount in controversy, exclusive of costs and interest, is alleged to exceed $10,000.00.

Plaintiffs have filed a motion for a preliminary injunction, supported by affidavits and memorandum of law, in which they request an order enjoining defendants and all persons acting in concert with or under the authority of said defendants, pending the final disposition of this action, from entering into any contracts, opening or awarding contracts for construction, undertaking land purchases of acquisitions, site preparation, development, construction, or other activities relating to the proposed Kickapoo project; and from implementing any plan of construction which would alter the land and waters in the Kickapoo River Valley above LaFarge, Wisconsin.

Defendants and Interveners have filed counteraffidavits and memoranda of law.

The motion for a preliminary injunction is the subject of the present opinion and order. For the purpose of decision of this motion, and for this purpose only, I find as fact those propositions contained in the section of this opinion entitled "Facts".

FACTS

The Kickapoo River rises in Monroe County, Wisconsin and flows south and southwest through Vernon, Richland, and Crawford Counties, and empties into the Wisconsin River near Wauzeka, about 16 miles upstream from the junction of the latter stream with the Mississippi River. With the exception of two runoff-retarding dams on the headwaters of the west branch of the river, the Kickapoo is a free flowing river.

The Kickapoo Valley is subject to destructive floods of varying extents practically every year. About 13,000 acres of agricultural lands and eight urban areas below LaFarge sustain damage during major floods. There are no existing flood-control projects in the river basin.

The Kickapoo River Valley has in recent years undergone a period of economic decline. The area has little industry and shows a trend toward decreasing population.

The river itself is winding, slow-moving and shallow. The riverbed between the communities of LaFarge and Ontario is characterized by sedimentary formations of limestone and sandstone which appear as rock outcroppings and promontories along the tree clad valley slopes. Springs seeping through the rock formations support communities of rare terrestrial plants and an abundance of lichens and moss. Hemlock draws, stands of white and red pine, sugar maples and yellow birch are visible from the river.

The 12-mile stretch of the river between Ontario and LaFarge has become increasingly popular with canoeists because of its aesthetically pleasing bluffs and terrain and because the shallow depths and gentle current are suitable for beginning canoeists and family outings.

In 1962, Congress authorized a dam for the "control of destructive floodwaters and other purposes" on the Kickapoo River north of LaFarge in the Flood Control Act of 1962, § 203, 76 Stat. 1180. Section 203 of that Act provides that "the project for the Kickapoo River, Wisconsin, is hereby authorized substantially as recommended by the Chief of Engineers in House Document Numbered 557, Eighty-seventh Congress, at an estimated cost of $15,570,000." House Doc. No. 557 called for construction of a dam 71.5 feet high with an overall length of 1,440 feet which would require acquisition in fee title of 3,000 acres. Such a dam would have provided a conservation pool of 800 surface acres. Its total flood control storage capacity would have been 66,000 acre-feet. The project document also called for construction of supplementary levees at Gays Mills and Soldiers Grove requiring cost sharing commitments by each community. Such commitments have not yet been requested or received by the Corps of Engineers.

In 1972, defendants propose to begin construction of a dam north of LaFarge which is 103 feet high with an overall length of 3,960 feet. The dam will create a conservation pool with a surface of 1,780 acres and a flood control storage capacity of 124,000 acre-feet. Land acquisition of 9,560 acres in fee title would be required. Completion of the project as presently proposed would cause the inundation of most, if not all, of the 12-mile stretch of river between LaFarge and Ontario, resulting in the loss of that section of the river for purposes of river canoeing and the probable loss of substantial portions of the rare plant communities found on the cliffs overlooking that portion of the channel.

On February 18, 1972, the Corps of Engineers of the United States Army completed a "Final Environmental Statement" on the LaFarge Lake Project on the Kickapoo River. This environmental impact statement (hereinafter "EIS") is a voluminous document, consisting of 78 pages of text and 400–500 pages of plates and appendices. The EIS is organized under eight headings which correspond closely to the subject matter required under § 4332(2) (C), NEPA: Project Description; Environmental Setting without the Project; Environmental Impact of the Proposed Action; Adverse Environmental Effects which Cannot be Avoided Should the Project be Implemented; Alternatives to the Proposed Action; Short-Term Uses of Man's Environment as Compared to Maintenance and Enhancement of Long-Term Productivity; Irreversible or Irretrievable Commitments; Coordination with other Agencies; and Conclusion. Each of the above subjects is divided into numerous subdivisions. All told, fourteen alternatives for flood control, fish and wildlife management, and recreation are considered in the report. Comments on the final draft were requested from 20 federal and state agencies and officials and private organizations and individuals (including plaintiff herein, Sierra Club, John Muir Chapter). Comments were received and incorporated in the EIS from fifteen persons and organizations who responded. The final EIS has been forwarded to the Council on Environmental Quality.

## CLAIMS BASED ON THE NATIONAL ENVIRONMENTAL POLICY ACT OF 1969

Plaintiffs' first four claims arise under NEPA. These claims raise two issues: (1) the adequacy of the present EIS as a "detailed statement" treating the five specific subject areas set forth in § 4332(2) (C), NEPA; and (2) the effect of an alleged agency bias reflected throughout the statement in the treatment of the proposed project (its adverse impact, costs and benefits) and alternative actions.

Plaintiffs must show a substantial probability of success on the merits of these claims in order for a preliminary injunction to issue.

Plaintiffs contend that there have been inadequate studies and treatment of the subjects of siltation and water quality problems in the proposed impoundment;

that the present availability and utilization of other lake areas in southwestern Wisconsin have not been compiled and taken into account; that no exhaustive studies of the location, types, and quantities of vegetation present in the Kickapoo Valley have been made; and that various alternatives and combinations of alternatives are not discussed in the statement at all. For these reasons, plaintiffs contend that the present EIS does not constitute compliance with the mandates of § 4332(2) (C) "to the fullest extent possible" as required by NEPA.

■ Courts which have confronted the issue of judicial review of environmental impact statements agree on two basic points. First, a court may review a statement filed pursuant to § 4332(2) (C) to determine whether it complies with the procedural requirements of NEPA. Natural Resources Defense Council v. Morton, 458 F.2d 827 (D.C. Cir. 1972)'; Environmental Defense Fund v. T. V. A., 339 F.Supp. 806 (E.D. Tenn.1972); Conservation Council v. Froehlke, 340 F.Supp. 222 (M.D.N.C. 1972); Harrisburg Coalition against Ruining Environment v. Volpe, 330 F. Supp. 918 (M.D.Pa.1971); Environmental Defense Fund v. Corps of Engineers (Tennessee Tombigbee) 3 E.R.C. 1085 (D.D.C.1971); Environmental Defense Fund v. Corps of Engineers (Gilham Dam) 325 F.Supp. 749 (E.D.Ark.1971). Second, courts may not substitute their judgment regarding the wisdom, advisability and benefits of undertaking or not undertaking a particular project. Conservation Council v. Froehlke, *supra*; Environmental Defense Fund v. Hardin, 325 F.Supp. 1401 (D.D.C.1971); Committee for Nuclear Responsibility v. Seaborg, 463 F.2d 783 (D.C.Cir. 1971); Environmental Defense Fund v. Corps of Engineers, *supra*, 325 F.Supp. 728, at 738.

■ The National Environmental Policy Act has been termed an "environmental full disclosure act". Environmental Defense Fund v. Corps of Engineers, *supra*, 325 F.Supp. at 759.

The detailed statement required by § 4332(2) (C) must contain such information as will alert the public, other interested governmental agencies, the Council on Environmental Quality, the President, and the Congress of possible environmental consequences of proposed agency action. Section 4332(2) (C) does not require that every conceivable study be performed and that each problem be documented from every angle to explore its every potential for good or ill. Rather, what is required is that officials and agencies take a "hard look" at environmental consequences.

■ I am not convinced that plaintiffs have shown a sufficient probability of success on the merits of the contention that the statement in its present form does not constitute "full disclosure" as required by NEPA. With respect to the specific criticisms leveled against the statement in the areas of siltation, water quality, vegetation, and identification and discussion of alternatives, I find that the agency at least recognizes and puts interested persons on notice of problems which exist in these areas.

With respect to the issue of alleged agency bias, plaintiffs contend that notwithstanding *pro forma* compliance with the procedural mandates of NEPA, the use of misleading statements, double standards, distortion of benefits and understatement of disadvantages, and partial disclosures demonstrates a total lack of open-minded willingness to consider fairly all alternatives in the Kickapoo Valley. The revelation of such an administrative bias in the environmental statement, plaintiffs contend, invalidates it.

The issue of administrative bias in fulfilling the requirements of NEPA has been recognized and dealt with by only a few courts. See e. g., Environmental Defense Fund v. Corps of Engineers, 342 F.Supp. 1211 (E.D.Ark.1972); Conservation Council v. Froehlke, 340 F.Supp. 222 (M.D.N.C.1972); District of Columbia v. Volpe, 3 E.R.C. 1143 (D.C.Cir. 1971); Calvert Cliffs' Coordinating Committee, 449 F.2d 1109 (D.C.Cir. 1971).

In each case, the court seemed to recognize the possibility of administrative bias resulting from an arrangement by which an administrative agency, which is ultimately responsible for implementation of a project, is expected to evaluate and report upon the environmental impact of the project impartially, open-mindedly, and objectively.

The response of courts to this problem has been varied: to remand to the agency, insisting upon unbiased and open-minded evaluations in spite of the agency's contradictory roles (Dist. of Columbia v. Volpe, *supra*); acceptance of a not impartial statement where actual deposition of opposing experts are included in the EIS (Conservation Council v. Froehlke, *supra*); acceptance of an admittedly less than fair and impartial statement so long as the court determined that the statement constituted a record upon which a decisionmaker could arrive at an informed decision (Environmental Defense Fund v. Corps of Engineers, 342 F.Supp. 1211 (E.D.Ark.1972)).

■ Even if I were to assume, without deciding, that bias is reflected in the impact statement, I conclude that plaintiffs have failed to show a sufficient chance of success on the merits of their legal contention that bias on the part of the authoring administrative agency is automatic grounds for invalidation of the environmental impact statement; and further that they have failed to show a sufficient chance of success on the merits of a contention that the present statement is not a record upon which a decisionmaker could make an informed decision.

## NON-NEPA CLAIMS—LOCAL ASSURANCES

■ Plaintiffs base their fifth claim for preliminary injunctive relief upon the language of § 201 of the Flood Control Act of 1962, 76 Stat. § 1180 (1962), which provides as follows:

"Authorization for any flood control project herein adopted requiring local cooperation shall expire five years from the date on which local interests are notified in writing by the Department of the Army of the requirements of local cooperation, unless said interests shall within said time furnish assurances satisfactory to the Secretary of the Army that the required cooperation will be furnished."

Section 203 of the Flood Control Act of 1962 provides in part as follows:

"The following works of improvement [including the Kickapoo project] for the benefit of navigation and the control of destructive floodwaters and other purposes are hereby adopted and authorized to be prosecuted under the direction of the Secretary of the Army and the supervision of the Chief of Engineers in accordance with the plans in the respective reports hereinafter designated and subject to the conditions set forth therein. . . . "

The document designated thereinafter outlining the Kickapoo project is House Document 557, 87th Cong. That document provides in part as follows:

"Prior to construction of levees at Soldiers Grove and Gays Mills, local interests agree to provide all lands, easements, and rights-of-way necessary for construction of the project. . . "

Plaintiffs contend that receiving local assurance from the downstream communities of Gays Mills and Soldiers Grove is a condition precedent to proceeding with any work on the entire project, including the dam and reservoir. Plaintiffs contend that the provisions of § 201 and the overall scheme of the Flood Control Act of 1962 should not be frustrated by the expedient of not requesting the assurances for ten years after authorization of the project.

Defendants contend that the original project authorization (H. Doc. 557, 87th Cong.) provides for construction of the dam and reservoir prior to, and independently of, construction of these local protection levees.

The House document outlining the Kickapoo project is ambiguous with respect to whether the local assurances in the costs of construction and operation

of the proposed supplementary levees in Gays Mills and Soldiers Grove were intended to be a condition precedent to construction of the dam and reservoir phases of the project. Plaintiffs have failed to show that they have a sufficient chance of success on the merits of the contention that work on the dam and reservoir is illegal in the absence of assurances of local participation in construction and operation of levees downstream.

## NON-NEPA CLAIMS—CONGRESSIONAL AUTHORIZATION

Plaintiffs' sixth claim for relief is based upon the fact that the proportions and cost of the dam now proposed deviate substantially from the proportions set forth in House Doc. 557, 87th Cong. They contend that the Chief of Engineers lacks discretion to deviate from the specifications set forth in H. Doc. 557, 87th Cong.; and that, even if the Chief is vested with discretion, its exercise is justified only: (1) under changed circumstances which render the original specifications obsolete; and (2) in avoidance of undue rigidity when modifications are necessary and desirable. They rely on a series of cases which affirm that the appropriations process does not constitute substantive legislation and that ratification of agency action by appropriation is frowned upon. Greene v. McElroy, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959); Ex parte Endo, 323 U.S. 283, 65 S.Ct. 208, 89 L.Ed. 243 (1944); District of Columbia Federation of Civic Associations v. Airis, 129 U.S. App.D.C. 125, 391 F.2d 478 (1968); Maiatico v. United States, 112 U.S.App. D.C. 295, 302 F.2d 880 (1962).

The situation presented by the present claim is not one where no authorization has ever been given to the Chief of Engineers to proceed with construction of a multi-purpose dam at a site north of LaFarge, Wisconsin, on the Kickapoo River. Rather, the situation is one in which Congress clearly determined that the public interest would be served if such a dam were built. In a generic sense, therefore, the dam has been "authorized".

Other courts have determined that the Chief has considerable latitude to adjust the original plans, and that Congress itself must accept responsibility for determining whether a particular project is proceeding in accordance with its authorization, and, if not, to determine what if anything Congress wishes to do about it. Environmental Defense Fund v. Corps of Engineers, 325 F.Supp. 749, 754–755 (E.D.Ark.1971); United States v. 2,606.84 Acres of Land in Tarrant County, Texas, 432 F.2d 1286, 1279–1290 (5th Cir. 1970).

I conclude that plaintiffs have failed to show a sufficient chance of success on the merits of their contention that the Chief of Engineers acted beyond his discretion in modifying the original specifications tend that the stated ratio of 1.3 is based

## NON-NEPA CLAIMS—BENEFIT COST ANALYSIS

Plaintiffs' seventh claim is that the computation of the benefit-cost ratio of the proposed dam and reservoir project was improper. Plaintiffs contend that the stated ratio of 1.3 is based upon overestimations of growth of agricultural productivity and failure to quantify the recreational value of the Kickapoo in its present state. Plaintiffs allege that had the correct figures been used, the project would be exposed as unlawful under the Flood Control Act of 1936, 33 U.S.C. § 701a.

Attacks upon benefit-cost calculations performed by federal agencies have been rejected in a variety of contexts. See e. g., State of Oklahoma ex rel. Phillips v. Guy F. Atkinson Co., 313 U.S. 508, 61 S.Ct. 1050, 85 L.Ed. 1487 (1941); Conservation Council of North Carolina v. Froehlke, 340 F.Supp. 222 (M.D.N.C. 1972); Environmental Defense Fund v. Corps of Engineers, 325 F.Supp. 728, 740 (E.D.Ark.1971); United States v. West Virginia Power Co., 122 F.2d 733 (4th Cir. 1941) cert. den. 314 U.S. 683, 62 S.Ct. 187, 86 L.Ed. 547. Calculation of the benefit-cost ratio on a particular

proposed project is a vague and complex process, subject to varying formulations and interpretations. Since opinions may differ widely as to which factors are appropriate and how they are to be weighed, the determination of benefits and costs is generally held to be a legislative function not amenable to judicial review.

I conclude that plaintiffs have failed to show a sufficient chance of success on the merits of their contention that the benefit-cost ratio has been improperly determined and that the project would be unlawful if such ratio were properly determined.

Accordingly, for the reasons stated above and on the basis of the entire record herein, it is hereby ordered that plaintiffs' motion for preliminary injunction is denied.