William **FORD** et al., Plaintiffs,

v.

Russell E. **TRAIN**, Chrmn. Council on Environmental Quality et al., Defendants.

No. 73–C–83.

United States District Court, W. D. Wisconsin.

June 15, 1973.

---

J. Steve Winter, Olson & Winter, Two Rivers, Wis., for plaintiffs; Francis J. Bouda, Cleveland, Wis., of counsel.

John O. Olson, U. S. Atty., Madison, Wis., for defendants Train, Brinegar and Paddock.

Robert W. Warren, Atty. Gen., by Charles Bleck, Asst. Atty. Gen., Madison, Wis., for defendants Clapp, Huber and Ryan.

JAMES E. DOYLE, District Judge.

This is a civil suit seeking injunctive and declaratory relief to restrain defendants from approving and implementing the Final Environmental Impact Statement for the Milwaukee to Green Bay Interstate Highway I–57 (Saukville to Bellevue section) and from taking any further action relating to the design, development, construction, site preparation, letting of contracts, purchasing of land, or any other activity concerning said proposed highway.

Jurisdiction is alleged under 5 U.S.C. § 702 and 28 U.S.C. §§ 1331(a), 1337,

2201 and 2202. The amount in controversy, exclusive of interest and costs, is alleged to exceed $10,000.00. The suit arises under The National Environmental Policy Act of 1969, 42 U.S.C. § 4321 et seq. (1970 Supp.) (hereinafter referred to as "NEPA"), The Environmental Quality Improvement Act of 1970, 42 U.S.C. § 4371 et seq. (1970 Supp.), and The Administrative Procedure Act, 5 U.S.C. § 701 et seq. (1970).

Plaintiffs have filed a motion for a preliminary injunction, supported by the verified complaint and a memorandum of law. Defendants have filed counter-affidavits and memoranda of law. For the purpose of this motion only, I find as fact those propositions contained in the section of this opinion entitled "Facts."

## FACTS

Plaintiff Ford owns a farm which lies within Corridor B, designated as the preferred corridor by the defendants at the hearings in December of 1970. His farming operation would be seriously impaired by the construction of an interstate highway in Corridor B. Plaintiffs Klessing, Dvorak and Salm own dairy farmland which lies within Corridor G. Their farming operations would be seriously impaired by construction of a highway in Corridor G, designated as the preferred corridor by the defendants at the December, 1971, hearings. Plaintiff Bouc owns a farm, including a natural wildlife area, which would be harmed by the construction of I–57 in Corridor "G." He is also the principal owner of a corporation developing land within Corridor G for recreational and agricultural purposes. Plaintiff, the STOP I–57 Environmental Alliance, is a nonprofit organization formed for the purpose of protecting Wisconsin's natural environment.

Defendant Train is Chairman of the Council on Environmental Quality. Defendant Brinegar is Secretary of Transportation. Defendant Paddock is the Division Engineer of the Federal Highway Administration. Defendant Clapp is Secretary of the Department of Transportation of the State of Wisconsin. Defendant Huber is Chairman of the State Highway Commission. Defendant Ryan is the District Engineer in charge of the I–57 project at the Green Bay office of the Division of Highways, Department of Transportation for the State of Wisconsin.

Following a request by the State of Wisconsin (hereinafter referred to as "the State"), the Federal Highway Administration (hereinafter referred to as the "FHWA") approved a proposed interstate highway I–57 linking the cities of Milwaukee and Green Bay, extending northerly from a junction with Interstate Route 94 in Milwaukee to an intersection with Highway 41 northwest of Green Bay. The Wisconsin Department of Transportation requested said general route after studying the national, state, and local need for the proposed project. Factors evaluated were population trends, agricultural and industrial highway needs, the need for improved highway connections with Wisconsin ports, and the need for improved access to recreational areas. The inadequacy of the existing north-south routes (discussed below) was noted.

The geographical area in question lies north of Milwaukee and south of Green Bay, and it is bounded on the east by Lake Michigan and on the west by the Fox River Valley. It includes productive farmland, historic geographic sites, such as the Kettle Moraine, the Niagra Escarpment, and Ice Age Eskers, wildlife wetland areas, parks, conservation areas, two salmon spawning streams, and national scientific reserves. It contains only two cities having populations in excess of 50,000 each: Oshkosh and Appleton, both of which lie within the Fox River Valley.

Presently within said area are three major routes extending northward from Milwaukee to Green Bay: (1) U.S. Highway 41, which is the western route and which lies west of Lake Winnebago

and west of the Fox River, currently exists as "a part freeway, part expressway facility, i. e., a four-lane divided highway"; (2) State Highway 57, which is centrally located, currently exists as primarily a two-lane highway with portions widened to four lanes, but with a roadbed between Saukville and Kiel of sufficient width to provide a four-lane divided highway; and (3) U.S. Highway 141, which is the eastern route, currently includes a four-lane divided highway (complete or under construction) between Saukville and Sheboygan; and a two-lane highway between Sheboygan and Denmark.

The State originally considered studying centrally located corridors[1] for the Interstate because State Highway 57 had been planned as a high-grade arterial in an earlier state plan and these corridors also represented the shortest distance between the approved termini, an inexpensive but scenic route. With the aid of the University of Wisconsin's Environmental Awareness Center, several alternative corridors were evaluated with respect to nine determinants: least engineering difficulty, least construction costs, least acquisition costs, traffic service,[2] least impact upon the cultural system,[3] least impact upon the ecological system, least impact upon quality agricultural lands, greatest scenic potential,[4] and least impact upon potential recreation and conservation lands. However, this study did not cover U.S. 41. U.S. 41 was not considered in any depth because of an earlier determination that it was unable to meet the transportation needs of the local areas which it already serves and the additional needs of the state. See Final Environmental Impact Statement, pp. 173–76, 367, 431, 436. This study was used in conjunction with field investigations, public discussion,

and other studies to enable the Division of Highways to select six potential corridors for a centrally located interstate facility.

On December 1 and 2, 1970, location hearings were held presenting these six central corridors. No Environmental Impact Statement (hereinafter referred to as "EIS") was provided prior to said hearings. At the hearings, environmental considerations were discussed. The December 1 hearing was attended by 650 persons with 45 testifying; 200 persons attended the December 2 hearing with 32 testifying; and 450 persons attended the informal sessions prior to the hearings.

Alternative corridor B which in part follows existing State Highway 57 was designated the preferred corridor by the State. However, the public reacted strongly against all of the new central routes proposed and suggested the use of existing routes 57 or U.S. 141. In August, 1971, Governor Lucey requested the Wisconsin Highway Commission to consider whether U.S. 141 was eligible for Federal Interstate Highway Aid.

The State conducted further studies on existing State Highway 57 and on corridors F and G, following existing U.S. 141 in part, and determined that although more expensive, the eastern corridors F and G would be less environmentally damaging, not endangering the Kettle Moraine glacial rock formation area along State Highway 57.

At the time the decision was made to study additional corridors, FHWA regulation PPM 90–1 (Aug. 24, 1971) was issued requiring that a draft environmental statement be made available to the public not later than the first required notice of public hearings as set out in PPM 20–8. Hearings on corri-

1. A corridor is a variable width path, averaging one mile in breadth, and extending from terminus to terminus.

2. "A measure of potential traffic generated by projected urban and recreational centers."

3. "The minimization of disruption of residential units and incompatibility with existing and proposed land uses."

4. "The maximization of the landscape's potential to depict the rural Wisconsin scene at interstate design speeds through identification of scenic resources and evaluation."

dors F and G were postponed twice to enable the State to satisfy this requirement. The 1971 draft EIS, a 34 page document, was offered to the public and circulated to 70 federal, state, and local agencies thirty days in advance of the scheduled hearings. This draft covered only alternatives F and G in depth, stating that a comprehensive draft would be forthcoming covering the central corridors which had been presented at the 1970 meetings. The 1971 draft did not cover the southern portion of the proposed corridors F and G, the part of U.S. 141 from Saukville to Erdman. Said portions of U.S. 141 had been given design approval previously to upgrade it to Interstate standards and part of said construction was already completed. An environmental reevaluation was made and the Division Engineer for the Wisconsin Division of the FHWA concluded that the earlier project had been executed in a manner which minimized adverse environmental consequences.

The first draft of the EIS reveals that during the corridor location studies of the proposed I–57, three alternatives were considered: (1) to build no interstate system; (2) to select a central corridor as proposed at the December 1970, hearings; and (3) to select an eastern corridor along U.S. 141. The first draft contains no discussion of the alternative U.S. 41. The final EIS (adopted by the FHWA in January, 1973) reveals that U.S. 41 was considered and rejected for the following reasons:

(a) The barrier effected by Lake Winnebago and the Fox River would negate any possibility of effectively serving the area lying between Lake Winnebago and Lake Michigan.

(b) The present facility is now being upgraded to Freeway Standards based on present and future traffic to serve this area 30 to 35 miles west of the preferred Corridor G.

(c) USH 41 could not be reconstructed to accommodate the traffic demands the introduction of the Interstate would place on it without extensive relocation and reconstruction. The present facility will ideally suit the needs for the present and future once upgraded to freeway standards if the Interstate is not routed on it. Our early planning studies indicated that the travel desires and service were needed in the easterly portion of the study area.

Plaintiffs have alleged on information and belief that at the time the decision was made to abandon the centrally located corridors and to consider other alternatives, U.S. 41 was not included among the alternatives and was not reconsidered. On the present record, I can find only that no new extensive studies on U.S. 41 were conducted following the abandonment of the centrally located corridors and at the time U.S. 141 was considered in depth. I cannot make a finding as to whether the defendants reconsidered their earlier decision to reject U.S. 41 (in favor of the central corridors) and once again rejected U.S. 41 in favor of the eastern corridors.

The hearings on corridors F and G were held on December 15 and 16, 1971, with the State recommending corridor G. On December 14, 1971, 430 persons attended the information session prior to the formal hearings held on December 15; the December 15 hearings were attended by at least 600 persons with 67 persons testifying. On December 16, 1971, 150 attended in the morning, 120 in the afternoon, and 50 in the evening.

On March 9, 1972, a joint statement issued by Governor Lucey and Mr. Huber revealed that the State Highway Commission had unanimously chosen Corridor G. In March of 1972, pursuant to Wis.Stats. § 84.29, funds were released for further in depth study of a flexible corridor following Route 141.

In May, 1972, the second draft of the EIS was prepared and offered to the public. Said 478 page draft included a discussion of the six central proposed

corridors and of the southern portion of the eastern corridors F and G. On June 6, 1972, the draft was sent to the Council on Environmental Quality (hereinafter referred to as "CEQ"), was made available to the public (pursuant to newspaper notice), and was circulated to the 70 governmental agencies which had reviewed the first draft.

On November 21, 1972, the final EIS (a 626 page volume) was approved by the State Highway Department, and it was adopted by the FHWA on January 8, 1973. The approval of the FHWA indicates that said agency has determined that the final EIS is a thorough environmental study of the proposed I-57 corridor G and that it presents the information necessary for an informed decision about the proposed project. Approval of the final EIS by the Secretary of Transportation of the United States was received February 27, 1973; the final EIS was transmitted to the CEQ on the same day; and notice of the availability of the final EIS to the public was published in area papers over a period of two weeks, ending March 29, 1973. No further action (including final design or location approval) had been taken by the defendants as of May 2, 1973, pursuant to the defendants' policy of not taking any action on a proposed project until 30 days after the date of publication of the notice of availability of the final EIS.

A Location Study Report was drafted in December of 1972 outlining the engineering proposal for the highway. Although not completely incorporated into the final EIS, it has been available to the public as a public document since its drafting.

On May 7, 1973, the CEQ informed the Department of Transportation by letter that it had reviewed the final EIS; that the final EIS "satisfactorily discusses and compares the general impact of the broadly defined corridor alternatives"; but that the CEQ felt that additional information should be provided about the environmental effects of the alternatives within the one mile wide preferred corridor G. On May 15, 1973, the FHWA and the Wisconsin Highway Commission agreed to prepare a supplemental statement to meet the objection of the CEQ.

OPINION

The plaintiffs contend that the building of I-57 should be enjoined because there is no need for a new federally funded highway of interstate caliber in the area between Milwaukee and Green Bay. Plaintiffs also urge that the final EIS is inadequate in that it fails to provide the environmental information needed for rational decision making; that it does not present a reasoned choice of alternatives; that it fails to discuss fully the impact of the proposed highway on wildlife and on water bodies; that it does not consider the environmental impact of further commercial development along the proposed highway; that the State Highway Department was biased; and that the data and information contained in the Location Report was not fully incorporated into the final EIS. Plaintiffs further contend that the procedures followed by the defendants were inadequate; specifically, that the defendants should have prepared and circulated a draft EIS prior to the public hearings of December, 1970; that the initial draft of the EIS was untimely and inadequate with respect to the second public hearings and that consequently a third public hearing should have been held to discuss the second draft of the EIS; that the State Highway Commission was without authority to issue a joint statement with Governor Lucey declaring that the proposed interstate highway would be built along U.S. 141, prior to the issuance of the second draft of the EIS; that the defendants failed to reconsider U.S. 41 at the time that the central corridors were rejected and the eastern corridors were studied in depth; and that there was a delay of 26 days between the submission of the final EIS to the CEQ and the publication of the notice of public

availability of said document, reducing the time for public comment from 30 days to 4 days.

In Sierra Club v. Froehlke, 345 F. Supp. 440 (W.D.Wis.1972), this court stated (at p. 444):

> Courts which have confronted the issue of judicial review of environmental impact statements agree on two basic points. First, a court may review a statement filed pursuant to § 4332(2)(C) to determine whether it complies with the procedural requirements of NEPA. Natural Resources Defense Council v. Morton, 148 U.S. App.D.C. 5, 458 F.2d 827 (1972); Environmental Defense Fund v. T. V. A., 339 F.Supp. 806 (E.D.Tenn.1972); Conservation Council v. Froehlke, 340 F.Supp. 222 (M.D.N.C.1972); Harrisburg Coalition against Ruining the Environment v. Volpe, 330 F.Supp. 918 (M.D.Pa.1971); Environmental Defense Fund v. Corps of Engineers (Tennessee Tombigbee) 331 F.Supp. 925 (D.D.C.1971); Environmental Defense Fund v. Corps of Engineers (Gilham Dam) 325 F.Supp. 749 (E.D. Ark.1971). Second, courts may not substitute their judgment regarding the wisdom, advisability and benefits of undertaking or not undertaking a particular project. Conservation Council v. Froehlke, *supra*; Environmental Defense Fund v. Hardin, 325 F.Supp. 1401 (D.D.C.1971); Committee for Nuclear Responsibility v. Seaborg, 149 U.S.App.D.C. 380, 463 F.2d 783 (1971); Environmental Defense Fund v. Corps of Engineers, *supra*, 325 F.Supp. at 738.

The National Environmental Policy Act has been termed an "environmental full disclosure act". Environmental Defense Fund v. Corps of Engineers, *supra*, 325 F.Supp. at 759. The detailed statement required by § 4332(2)(C) must contain such information as will alert the public, other interested governmental agencies, the Council on Environmental Quality, the President, and the Congress of possible environmental consequences of proposed agency action. Section 4332(2)(C) does not require that every conceivable study be performed and that each problem be documented from every angle to explore its every potential for good or ill. Rather, what is required is that officials and agencies take a "hard look" at environmental consequences.

■ Plaintiffs first contend that because there is no need for I–57, the construction of said highway will violate NEPA. Assuming that the legal theory propounded by plaintiffs is correct, plaintiffs have not demonstrated a sufficient probability of success in establishing the factual basis for their contention. I have found that the State Highway Commission determined that the challenged interstate facility was needed and that the FHWA concurred in said finding. This court should not substitute its judgment about the basic need for this project for the judgment of said agencies.

■ Furthermore, I am not convinced that plaintiffs have shown a sufficient probability of success on the merits of the contention that the final EIS does not constitute "full disclosure" as required by NEPA. With respect to the specific deficiencies mentioned, I conclude on the basis of the final EIS that the defendants at least recognize and put interested persons on notice of problems with respect to the impact of the proposed highway on wildlife and on water-bodies. The impact of future incidental commercial development is also considered.

Plaintiffs' major concern is that the alternative proposal of improving U.S. Highway 41 did not receive either adequate study or exposure to the public. Although the Highway 41 alternative was rejected as infeasible prior to the University of Wisconsin study, plaintiffs have not demonstrated a sufficient probability of success on the merits of the contention that consequently the final EIS did not contain information which would alert the public and other govern-

mental agencies about this rejected alternative.

Plaintiffs also urge that defendants violated NEPA by failing to reconsider the alternative of improving Highway 41 at the time that the central corridors (specifically preferred central corridor B) were rejected. On the present record, at most I can conclude that no further extensive studies of the feasibility of Highway 41 were conducted at the time of the abandonment of the central corridors. However, I cannot find that defendants failed to review their prior consideration of Highway 41 at the time that U.S. 141 was being studied intensively. Perhaps a court should intervene when the executive agencies have simply disregarded an alternative which is obvious and which is clearly feasible to accomplish the purpose. But plaintiffs have not yet made a sufficient showing that this occurred with respect to Highway 41. I cannot conclude on the basis of this argument that plaintiffs have a substantial probability of success in proving that the defendant agencies failed to take a sufficiently "hard look" at the environmental consequences of their decision to reject the Highway 41 alternative and to adopt proposed corridor G. *See* Sierra Club v. Froehlke, *supra*, 345 F.Supp. at 444.

Plaintiffs assert that the final EIS is inadequate because of alleged bias on the part of the administrative agencies, and because there was merely *pro forma* compliance with the mandates of NEPA. First, I note that the verified complaint contains only broad conclusory allegations of bias arising from the inherently contradictory roles under NEPA of the federal and state agencies. On one hand, said agencies must ultimately implement the proposed project; on the other, they must impartially evaluate and report upon the environmental impact of the project. But even assuming that bias is reflected in the final EIS, plaintiffs have failed to demonstrate a sufficient probability of success on the merits of their legal contention that bias on the part of the authoring administra-

tive agencies automatically invalidates an environmental impact statement. Sierra Club v. Froehlke, *supra* at 445.

Finally, plaintiffs have not cited nor am I aware of any authority for the proposition that the failure to include in the final EIS a Location Report, including a tabulation of the opinions expressed by persons testifying or submitting written opinions during the 1971 hearings, automatically invalidates the statement. I note that the final EIS does contain approximately 300 pages of comments received and responses given to the draft environmental statements and public hearing testimony and correspondence. Plaintiffs conclusorily allege in the verified complaint that the views of citizens appearing and expressing themselves have been changed and misrepresented by editing. However, I cannot make such a factual finding on the present record.

■ Plaintiffs suggested in oral argument that a letter from the CEQ to the Department of Transportation, dated May 7, 1973, supports their contention that the final EIS was inadequate. Said letter provides in pertinent part:

> We have reviewed the final environmental statement for I–57 from Milwaukee to Green Bay, Wis. We understand that you are withholding location approval pending a resolution of our difficulties with the final impact statement.
>
> In our opinion the final impact statement for I–57 satisfactorily discusses and compares the general impact of the broadly defined corridor alternatives. However, the preferred corridor G is in itself a mile wide. We feel that additional detail is needed to determine the environmental effects of the alternatives within that corridor.

Because the criticism by the CEQ is limited to the discussion of alternatives within the one-mile wide preferred corridor G, I am not persuaded by this letter that the final EIS, if otherwise adequate, should be invalidated.

I note that throughout the complaint and plaintiffs' briefs, plaintiffs suggest that the first and second environmental drafts, which preceded the final EIS, contain substantive inadequacies which plaintiffs do not suggest are present in the final EIS. Because under NEPA, draft environmental statements are prepared and circulated for the purpose of soliciting agency and public comment which is later incorporated into subsequent drafts, and ordinarily the final EIS will be more detailed and comprehensive than the preceding drafts, said drafts, by their nature, are tentative and subject to change. I cannot conclude on the present record that plaintiffs have a substantial probability of success in establishing that either the first or second draft EIS was substantively inadequate.

Turning to the procedural contentions raised by plaintiffs, it is first argued that the defendants should have prepared and circulated a draft EIS prior to the public hearings in December of 1970. However, plaintiffs admit in their reply brief that the National Environmental Policy Act Guidelines for Implementation, proposed by the FHWA (November 30, 1970) did not require the preparation of an EIS prior to the public hearings. Moreover, Policy and Procedure Memorandum 20–8 (January 14, 1969) (hereinafter referred to as "PPM 20–8"), pursuant to which the 1970 hearings were conducted, did not require that a draft environmental statement be circulated. 3 ELR 46505. Therefore, I conclude that plaintiffs have not demonstrated a sufficient probability of success on the merits of this contention.

Plaintiffs' second contention is that the first draft EIS was not timely with respect to the second public hearings held December 15 and 16, 1971. On April 23, 1971, the CEQ published guidelines requiring the circulation of a draft EIS 15 days prior to a public hearing. 3 ELR 46051(10)(e). These guidelines were modified by Policy and Procedure Memorandum 90–1 (August 24, 1971) (hereinafter referred to as "PPM 90–1"), which required public circulation of the draft EIS "not later than the first required notice of location public hearing (30 to 40 days before date of hearing) or notice of opportunity for a public hearing as set out in PPM 20–8." 3 ELR 46107(6)(c). PPM 20–8 provides that notice of opportunity for a public hearing must first be published from 30 to 40 days before the date of hearing. 3 ELR 46505.

I have found that the 34-page first draft EIS was offered to the public 30 days in advance of the scheduled December, 1971, hearings. Therefore I conclude that plaintiffs do not have a reasonable probability of success on the merits of this contention.

■ Plaintiffs further contend that the 34-page first draft EIS circulated prior to the December, 1971, hearings was inadequate for said hearings; and that because it was inadequate, when the second more comprehensive draft EIS was circulated in 1972, a hearing on the additional materials was required. NEPA does not provide that agencies must hold public hearings to investigate the environmental consequences of proposed action or in connection with the preparation of, or following the completion of, a draft or final EIS. Instead, it requires consultation with federal agencies and circulation of drafts to solicit comments from appropriate federal, state and local agencies. 42 U.S.C. § 4332(2)(C). *See* City of New York v. United States, 344 F.Supp. 929, 940 (E.D.N.Y.1972); San Francisco Tomorrow v. Romney, 342 F.Supp. 77, 80 (N.D.Cal.1972).

However, pursuant to NEPA's broad mandate that all federal agencies shall develop methods of assuring that environmental values are considered in decision making, 42 U.S.C. § 4332(2)(B), (C), the FHWA issued PPM 90–1. PPM 90–1 does not affirmatively provide for public hearings, but it refers to PPM 20–8 in the following passage:

> The draft environmental statement . . . is to be circulated by the HA

to the appropriate agencies . . . for comment, and made available to the public not later than the first required notice of location public hearing . . . or notice of opportunity for a public hearing as set out in PPM 20–8. . . . The comments as received from other agencies are to be made available at either the FHWA Division or HA office for public review and copying. If the highway section qualified for exemption from public hearings procedures (PPM 20–8) and a public hearing is not afforded a draft environmental statement if required . . . is to be prepared and circulated for comment, and made available to the public as early as practicable. . . . An additional location or design public hearing will not be required for the sole purpose of presenting and receiving comments on the draft environmental statement for those projects which were processed in accordance with procedures in effect at the time. PPM 90–1(6)(C), 3 ELR 46106, 46108.

PPM 20–8 was issued on January 14, 1969, prior to the effective date of NEPA, January 1, 1970. Therefore it is possible that the above-cited passage from PPM 90–1 was intended merely to coordinate the FHWA's hearing regulations under the Federal-aid Highway Act, 23 U.S.C. § 101 et seq. and the Department of Transportation Act, 49 U.S.C. §§ 1651(a), (b)(2), 1657(e)(1), with its present duties under NEPA. On the other hand, the FHWA may have intended to make its past procedures for assuring public hearings an integral aspect of its new procedures under NEPA, considering public hearings as a means of assuring full consideration of environmental values in its decision making. Assuming that the latter proposition is correct, then the question is whether PPM 20–8 requires an additional public hearing each time a draft EIS is substantially supplemented.

PPM 20–8 (January 14, 1969) provides in pertinent part:

## 7. OPPORTUNITY FOR PUBLIC HEARINGS

a. A State may satisfy the requirements for a public hearing by (1) holding a public hearing, or (2) publishing 2 notices of opportunity for public hearing and holding a public hearing if any written requests for such a hearing are received.

\* \* \* \* \* \*

c. The opportunity for another hearing shall be afforded in any case where proposed locations or designs are so changed from those presented in the notices specified above or at a public hearing as to have a substantially different social, economic, or environmental effect. 3 ELR 46505.

On July 12, 1972, it was amended to add a new paragraph 6(g) as follows:

(g) With respect to any project for which a public hearing has been held under Federal procedures and for which it is determined by the State highway department and the Division Engineer that a new hearing is desirable to consider supplemental information on social, economic, or environmental effects relative to proposals presented at a previous public hearing or with respect to additional proposals, then, as appropriate, a new corridor or design hearing should be held. . . . 3 ELR 46520.

■ On the basis on the cited sections of PPM 20–8, I conclude that plaintiffs do not have a substantial probability of success on the merits of the contention that NEPA, as implemented by the FHWA regulations, required public hearings on the second EIS draft. The initial EIS distributed in advance of the first public hearing discussed the environmental consequences of proposed corridor G, which was ultimately selected as the preferred corridor. Because neither the proposed location nor the design was substantially changed after the first hearing, and because the State Highway Commission and the Division Engineer did not deter-

mine that such a hearing would be desirable, no additional public hearing was required for comments on the second draft EIS.

Plaintiffs urge that defendant Huber erred when he issued a joint statement with Governor Lucey on March 9, 1972, stating that the State Highway Commission had unanimously chosen corridor G. This statement was issued after the circulation of the initial draft EIS and the second set of public hearings, but two months prior to the circulation of the second draft EIS. Plaintiffs have not cited nor am I aware of any legislative, administrative, or judicial authority in support of this contention nor have they established that the challenged statement interfered with the realization of the underlying policies of NEPA. Therefore, I conclude that plaintiffs have not met their burden with respect to this contention.

Finally, plaintiffs argue that defendants improperly allowed 26 days to elapse between the time the final EIS was submitted to the CEQ and the time when said document was offered to the public for comment. Plaintiffs urge that this delay violates PPM 90–1, 61(2)(b). I have found that the final EIS was approved by the Secretary of Transportation on February 27, 1973, and was transmitted to the CEQ on the same day; that notice of the availability of the final EIS was published in area papers over a period of two weeks ending March 29, 1973; and that neither final location or design approval was given during the 30 days following the publication of the last notice of availability.

PPM 90–1, 1(2)(b) provides in pertinent part:

1. The Regional Federal Highway Administration shall be responsible for:

\*　　\*　　\*　　\*　　\*　　\*

(2) Assuring that the following time limitations have expired prior to FHWA's approval of the location (or design if the location was previously approved.)

(a) Ninety (90) days have expired since the draft environmental statement was circulated for comment, sent to CEQ (postmarked), and made available to the public or described in 6g.

(b) Thirty (30) days have expired since the final environmental statement was made available to both CEQ and the public. This time period may run concurrently with the ninety (90) day period. 3 ELR 46106, 46108.

Neither the above quoted section nor any other section of PPM 90–1 provides for concurrent public and CEQ review of the final EIS. The above-cited passage requires only that 30 days elapse between the time that the final EIS is available to both the CEQ and the public and the time that the location and design of the proposed highway are finally approved by the FHWA. On the present record it appears that this requirement was satisfied.

Accordingly, on the basis of the entire record herein and for the reasons stated above, it is hereby ordered that the plaintiffs' motion for a preliminary injunction is denied.