**ENVIRONMENTAL DEFENSE FUND, Committee for Leaving the Environment of America Natural (Clean), National Wildlife Federation, and Florida Audubon Society, Plaintiffs,**

v.

**Clifford M. HARDIN, Secretary of Agriculture, United States Department of Agriculture, and Agricultural Research Service, Defendants.**

**Civ. A. No. 2319–70.**

United States District Court, District of Columbia.

April 14, 1971.

Edward Lee Rogers, East Setauket, N. Y., Jon T. Brown, Wallace L. Duncan, Washington, D. C., for Environmental Defense Fund and CLEAN.

Robert M. Kennan, Jr., Washington, D. C., for National Wildlife Federation.

David Gluckman, Orlando, Fla., for Audubon Society.

Walter Kiechel, Jr., Kenneth F. Hoffman, and Stuart B. Shoenburg, Attys., Dept. of Justice, Washington, D. C., for defendants.

### MEMORANDUM

GASCH, District Judge.

Plaintiffs, through this action, seek to enjoin the Secretary of Agriculture from undertaking a cooperative Federal-State program to control the imported fire ant in the southeastern United States. The details of this program and the facts and circumstances surrounding it are more fully set out in the Findings of Fact which accompany this Memorandum. Plaintiffs' petition for injunction is based on their allegations that the Secretary has failed to satisfy the requirements of the National Environmental Policy Act of 1969, Pub.L. No. 91–190, 91st Cong., 1st Sess., 83 Stat. 852 (January 1, 1970), 42 U.S.C. § 4331 et seq. It is, therefore, appropriate to examine the purposes and requirements of this Act and to delineate the scope of ju-

dicial review of agency action with respect to it.

Section 101 of the National Environmental Policy Act expresses the underlying legislative policy.

The Congress, recognizing the profound impact of man's activity on the interrelations of all components of the natural environment, particularly the profound influences of population growth; high-density urbanization, industrial expansion, resource exploitation, and new and expending technological advances and recognizing further the critical importance of restoring and maintaining environmental quality to the overall welfare and development of man, declares that it is the continuing policy of the Federal Government, in cooperation with State and local governments, and other concerned public and private organizations, to use all practicable means and measures, including financial and technical assistance, in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans. 42 U.S.C. § 4331(a).

One of the methods chosen by Congress to implement the policy enunciated above was the creation of the Council on Environmental Quality, 42 U.S.C. §§ 4341–4347. This independent agency will provide a consistent and expert source of review of national policies, environmental problems and trends, and aid in the coordination of governmental programs affecting the environment.

In addition to establishing the Council, Congress specified certain procedural requirements with which the executive agencies must comply prior to initiating a program which will affect the environment. It is this section of the Act with which we are concerned in this action.

Congress did not intend by the Act to relocate or diminish the decisionmaking responsibility currently existing with respect to such programs, but it did intend to make such decisionmaking more responsive and more responsible. Environmental Defense Fund, Inc. v. Corps of Engineers, 1971, D.Ark., 325 F.Supp. 749. Broadly speaking the Act requires an agency to undertake research during the planning of its programs that is adequate to expose their potential environmental impact and to disclose the results of this research to other interested agencies. The details of these research and disclosure requirements are set out at 42 U.S.C. § 4332.

Under section 4332(2) (A) government agencies are directed to "utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment." This section makes the completion of an adequate research program a prerequisite to agency action. The adequacy of the research should be judged in light of the scope of the proposed program and the extent to which existing knowledge raises the possibility of potential adverse environmental effects. The Act envisions that program formulation will be directed by research results rather than that research programs will be designed to substantiate programs already decided upon. Thus, this provision of the Act requires a diligent research effort, undertaken in good faith, which utilizes effective methods and reflects the current state of the art of relevant scientific discipline.

Section 4332(2) (C) requires the initiating agency to prepare and distribute an environmental impact statement concerning proposed programs. This statement is to contain the results of the research conducted during the planning phase together with adequate documentation. The statement must be sufficiently detailed to allow a responsible executive to arrive at a reasonably accurate decision regarding the environmental benefits and detriments to be expect-

ed from program implementation. The statement should contain adequate discussion of alternative proposals to allow for program modification during agency review so that the results to be achieved will be in accordance with national environmental goals. This section also requires that other agencies of the government with special expertise in or legal jurisdiction over the subject matter of the program be consulted in advance of program definition. Comments and suggestions of these agencies should accompany the final impact statement.

A final procedural requirement of the Act is contained in section 4332(2) (G), which requires the agencies to "initiate and utilize ecological information in the planning and development of resource-oriented projects." This directive recognizes the growing importance of the environmental sciences and directs the agencies to undertake research of a broader scope than may have been traditionally within their jurisdiction.

Thus in reviewing the Department of Agriculture program under consideration here, the Court will not substitute its judgment for that of the Secretary on the merits of the proposed program but will require that the Secretary comply with the procedural requirements of the National Environmental Policy Act as outlined above.

Significant aspects of the Department of Agriculture's research program conducted in connection with the fire ant control program are set forth in the Court's Findings of Fact. The Court is satisfied that the scope and extent of this research is adequate to comply with the requirements of the Act. The environmental impact statement prepared by the Department, which forms part of the record of this case, is sufficient in detail and adequate in scope of coverage demanded by the Act.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter came on for hearing on plaintiffs' motion for preliminary in-

junction. Upon consideration of the pleadings and exhibits filed, extensive testimony taken in open Court, and counsel having been heard, the Court makes the following

## FINDINGS OF FACT

1. The imported fire ant (Solenopsis saevissima) was accidentally introduced into the Southern United States from South America sometime around 1918. It presently infests approximately 126 million acres in over 400 counties in the nine southeastern states of Alabama, Arkansas, Florida, Georgia, Louisiana, Mississippi, North Carolina, South Carolina, and Texas. This ant has reached the climatic limit of its range northward in this country. However, it could inhabit river-bottom and irrigated areas to the west of its present boundary and thereby considerably expand its range of infestation. Suitable habitats exist for the imported fire ant in large portions of California, Oregon, and Washington should breeding forms reach these areas.

2. The imported fire ant is a pest that adversely affects human health. Its sting is painful and the resulting pustule and lesion presents the risk of secondary infection. In a small number of sensitized persons the ant sting can cause allergic or anaphylactic reactions which may cause death. The United States Department of Health, Education, and Welfare has concluded that on the whole the fire ant "presents a low health hazard to humans in the United States."

3. The imported fire ant impedes agricultural activities in the infested areas. The ant builds large earthen mounds in pastures and open fields. The mounds interfere with clipping and harvesting operations and result in damage to the equipment used. Due to its sting the ant is a nuisance to farm workers and it impedes or prevents harvesting of hay and other pasture crops. The ant is not a serious agricultural pest in row crop or wooded areas.

4. At the insistence of local groups and governmental bodies and pursuant

to statutory authority and congressional direction, the Department of Agriculture undertook to alleviate the harm caused by the imported fire ant.

5. After extensive analysis of and experimentation with over 400 chemicals, the chlorinated hydrocarbon Mirex was selected by the Department of Agriculture as the safest, effective, currently available chemical for control of the imported fire ant.

6. The chemical Mirex is used almost exclusively as a pesticide for the control of fire ants. This insecticide is applied to ant infested areas in the form of Mirex bait. The bait is prepared by impregnating one and one-quarter pounds of screened corn cob grits with soybean oil containing one-seventeenth of an ounce of Mirex which constitutes the standard dose for an acre of infested ground. Mirex is a delayed action insecticide. It is carried back to the mounds by worker ants where it is transmitted to the rest of the colony. Extermination of the colony is usually not accomplished until several weeks after treatment.

7. Research by scientists of the Department of Agriculture and others has raised the question of the potential danger to the environment caused by Mirex toxicants. Its effect on estuaries is of particular concern.

8. When administered in large doses, Mirex is directly toxic to shrimp, crabs and other marine organisms. Mirex bait is toxic to other species of ants, especially oil-feeding ants. Mirex in heavy doses induces tumors in animals in laboratory tests and is a potential danger as a carcinogen for man.

9. Mirex is a persistent pesticide that is not readily metabolized into non-toxic substances. Mirex residues are found in many non-target organisms present in treated areas and it is concentrated in the higher levels of the food chains.

10. The United States Department of Agriculture (USDA) in cooperation with the nine southeastern states has proposed a program to control but generally not to eradicate the fire ant in areas where severe infestation has caused damage. The program involves the aerial application of Mirex bait at the rate of one and one-quarter pounds of bait per acre to 5,600,000 acres (the acreage most heavily infested by the imported fire ant). Under the plan, no forested areas, estuarine areas, game and wildlife refuges, or those areas contiguous to rivers are to be treated. The program was scheduled to begin on April 1, 1971, and continue throughout the summer. Most of the treated areas are to receive only one application, however, in some areas of Georgia which were previously baited, second and/or third treatments will be applied to complete the previous eradication program begun in those areas. On March 25, 1971, in Civil Action 14700, the United States District Court for the Northern District of Georgia refused to grant a preliminary injunction, holding that the Federal-State Fire Ant Eradication Program did not present an immediate hazard.

11. The USDA fire ant control program outlined above could significantly affect the quality of the human environment.

12. Scientists of the USDA, the United States Department of the Interior and others have conducted laboratory and field tests on the effects of Mirex on the environment. Estuarine areas have been monitored to detect Mirex residues in the water and key non-target organisms such as certain fish and birds have been examined for Mirex residues. In connection with a large-scale experiment conducted by the USDA on Cat Island in the Gulf of Mexico off the Mississippi coast to determine whether fire ant eradication was feasible, a study was made on the effects of Mirex on other organisms in the community. Before and at several intervals after the applications of Mirex bait to the island samples of terrestrial arthropods, terrestrial vertebrates and aquatic organisms, as well as soil and water samples were collected and analyzed for Mirex residues. These tests revealed that Mir-

ex was being concentrated in non-target organisms but that it was dissipated relatively rapidly after equilibrium was reached. Although this test was not designed to test the chronic effects of the toxicant on the communities studied since population levels were not determined, all species were present, except certain oil-feeding ants, after treatment and appeared to be at normal population levels.

13. Additional research relating to the fire ant control program has been undertaken by scientists of the USDA and others under contract to it. Work is continuing in many of these areas, which include the following:

(1) the mechanics and extent of the natural metabolic breakdown of Mirex;

(2) the extent to which Mirex induces of inhibits enzyme production in organisms in the higher levels of the food chain;

(3) the toxic effects of Mirex residues in fish;

(4) the alterations in community compositions due to avoidance of Mirex-treated areas by certain species of organisms;

(5) the physiological effects of Mirex toxicant on crustaceans and other marine organisms; and

(6) the biological and behavioral characteristics of the imported fire ant.

14. The USDA has concluded from its studies that if the fire ant control program is implemented, the presence of Mirex residues in the environment and the concentration of these residues in the food chain cannot be avoided. It has further concluded that the accumulation levels expected to result from field application of Mirex bait will have no serious adverse effect on the communities involved.

15. Various alternatives to the aerial application of Mirex bait were considered by the USDA in developing the fire ant control program. Ground application was rejected for the following reasons: (1) It was not effective since uniform coverage to reach all of the ants in a treated area cannot be accomplished by this method. (2) It could result in the application of extra dosages of Mirex because results would not be apparent for several weeks after the first application. Other alternatives considered involved the use of insecticides such as chlordane, dieldrin or heptachlor, the use of which has been shown to present a more serious ecological threat than the use of Mirex. The existing technology for the use of biological or behavioral control agents is insufficient for control purposes.

16. In evaluating the effect that the fire ant control program would have on the relationship between the local short-term use of the environment and the maintenance and enhancement of long-term productivity, the USDA considered the following factors: The reduction of the fire ant population will lessen the threat to human health which it now poses and will substantially benefit the agricultural economy in the infested states. Native ants with similar environmental requirements will fill the ecological niches opened by elimination of the fire ant in certain communities. Although Mirex is known to concentrate in the food chain, the relatively rapid dissipation of these residues noted to date and the lack of evidence of chronic effects on non-target populations support the conclusion that the use of Mirex at the proposed dosage will cause no excessive or irreversible impact on the environment.

17. The USDA after having prepared and distributed a draft impact statement to all interested agencies and after giving consideration to the replies received, prepared an Environmental Impact Statement which set forth the results of its studies of the fire ant and the environmental effects of Mirex, as outlined above, together with supporting documentation and bibliography. This statement has been distributed to all interested governmental agencies including the Council on Environmental Quality and the Environmental Protection Agency.

18. The Environmental Protection Agency has commenced administrative procedures under 7 U.S.C. § 135, to determine whether the registration of Mirex under the Federal Insecticide, Fungicide, and Rodenticide Act should be cancelled.

Based on the foregoing Findings of Fact, the Court makes the following

## CONCLUSIONS OF LAW

■■■ 1. The institution of administrative proceedings under 7 U.S.C. § 135, which provides that judicial review of that administrative determination rests in the United States Court of Appeals for the District of Columbia, does not deprive this Court of jurisdiction over the present action. This action is brought under the National Environmental Policy Act which establishes procedures for governmental agencies undertaking programs that may affect the quality of the environment. While such programs may involve the use of substances registered under the Federal Insecticide Act, such use does not exempt the program from the requirements of the National Environmental Policy Act; nor does withdrawal of registration under the Federal In-secticide Act deprive this Court of jurisdiction under the NEPA.

■■ 2. The USDA fire ant control program is a major Federal action that will significantly affect the quality of the human environment and, therefore, is subject to the procedural requirements of 42 U.S.C. § 4332.

■■ 3. The USDA scientists and administrators have sufficiently studied the potential impact of widespread use of Mirex on the environment to satisfy the research and planning requirements of the National Environmental Policy Act.

4. The Environmental Impact Statement prepared by the USDA relating to the fire ant control program sets forth the expected environmental effects of that program in sufficient detail to satisfy the disclosure requirements of the National Environmental Policy Act.

■■ 5. Plaintiffs have failed to demonstrate that they will suffer irreparable injury if the preliminary injunction is not granted.

6. Plaintiffs have not demonstrated that they are likely to succeed in proving the allegations of their complaint in the final determination of this matter.