SAVE AMERICA'S VITAL ENVIRON-
MENT, INC. (SAVE) et al.

v.

Earl BUTZ, Secretary of the United States
Department of Agriculture, and Tom-
my Irvin, Commissioner of Agriculture
of the State of Georgia.

Civ. A. No. 17108.

United States District Court,
N. D. Georgia,
Atlanta Division.

Sept. 8, 1972.

Michael D. Padnos, Atlanta, Ga., for plaintiffs.

John W. Stokes, Jr., U. S. Atty., Charney K. Berger, Julian M. Longley, Asst.

U. S. Attys., Atlanta, Ga., and Richard Studenny, Atty., U. S. Dept. of Agriculture, Washington, D. C., for defendant Butz.

Arthur K. Bolton, Atty. Gen. of Georgia, Larry D. Ruskaup, Asst. Atty. Gen., Atlanta, Ga., for defendant Irvin.

## ORDER

EDENFIELD, District Judge.

On Labor Day afternoon, September 4, 1972, I was contacted at my home by counsel for plaintiffs and asked to consider a motion they wished to file for a temporary restraining order. Counsel represented that some airplanes loaded with a pesticide called Mirex were poised on their runways and about to embark on an aerial application program designed to control the imported fire ant (*Solenopais sasvissima richteri*), which ravages Georgia and eight other southeastern states,[1] and that pursuant to this program land owned by or of interest to plaintiffs and a class of others plaintiffs wished to represent would be sprayed with Mirex. Counsel contended that the spraying of this land with Mirex was illegal and would result in irreparable harm. I instructed counsel for plaintiffs to contact defendants and meet me at the courthouse at 5:00 P.M. Those present at the hearing which did take place at 5:00 P.M. were myself, counsel for plaintiffs, and counsel for defendant Tommy Irvin, Commissioner of Agriculture for the State of Georgia.

The allegations of the complaint filed with me that evening were that the Administrator of the Environmental Protection Agency ["EPA"] had issued an order prohibiting all application, aerial or otherwise, of Mirex on or near estuaries, rivers, streams, lakes, swamps, ponds, other aquatic areas, and heavily forested areas, that the issuance of this order was authorized by the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. §§ 135 et seq. (1970) ["FIFRA"], and that the defendants intended to aerially apply Mirex to land in Georgia even though it was physically impossible to do so without violating the Administrator's order. The complaint also stated that defendants' actions would result in violations of the Refuse Act, 33 U.S.C. § 407 (1970) (prohibits the discharge of any "refuse" into navigable waters or tributaries thereof) and of rules of the Georgia State Water Quality Control Board issued pursuant to the Georgia Water Quality Control Act, Ga.Code Ann. §§ 17–501 et seq. (1971)[2] (prohibits the discharge of harmful or toxic materials in Georgia waters without a permit).

The brief given to me that evening by counsel for plaintiffs explained that, essentially, plaintiffs were seeking judicial review under the Administrative Procedure Act of Secretary Butz' decision to provide Commissioner Irvin with federal funds and support for the imported fire ant control program in Georgia which involves the aerial application of Mirex. Plaintiffs' central claim was that this decision constituted final agency action which would adversely affect plaintiffs' interests as those interests are defined by FIFRA, the allegedly relevant statute, and that they were entitled to judi-

---

1. As a result the nine states have been quarantined by the United States Department of Agriculture. 7 C.F.R. § 301.-81 (1970).

2. According to the complaint the controversy involved more than $10,000 and arose under (1) FIFRA, (2) the Refuse Act, (3) 7 U.S.C. § 147a (1970) (authorizes the Secretary of Agriculture to embark on operations designed to eradicate and control the imported fire ant and other pests), and (4) the Water Pollution Control Act, 33 U.S.C. §§ 466

et seq. (1970), as amended by the Water Quality Improvement Act of 1970, 33 U.S.C. §§ 1151 et seq. (1970) (prohibits pollution of navigable waters). Plaintiffs alleged jurisdiction was vested in this court pursuant to (1) the Administrative Procedure Act, 5 U.S.C. §§ 701–706 (1970), (2) 28 U.S.C. § 1337 (1970) (cases arising under laws regulating commerce), (3) 28 U.S.C. § 1361 (1970) (mandamus), (4) 28 U.S.C. §§ 2201, 2202 (1970) (declaratory judgments), and (5), surprisingly, 28 U.S.C. § 1343(3) (1970).

cial review of that decision pursuant to Section 10 of the Administrative Procedure Act, 5 U.S.C. § 702 (1970). The brief included a citation to the broad language of Abbott Laboratories v. Gardner, 387 U.S. 136, 140–141, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), for support on this point.

Counsel for Commissioner Irvin, understandably, was unprepared that evening to adequately respond to plaintiffs' charges, but he took the tentative position that the Georgia Department of Agriculture was acting in full compliance with the EPA Administrator's order and with all other relevant federal and state statutes and regulations.

On the basis of the papers filed by plaintiffs—the complaint, the brief, a map of the land owned by plaintiff Calloway showing an abundance of heavily forested areas and numerous bodies of water, copies of two orders issued by the EPA Administrator, and some affidavits —and after consideration of the representations of counsel, I signed a temporary restraining order enjoining the aerial application by defendants of Mirex over the land owned by the named plaintiffs, and I ordered defendants to show cause the next day, September 5, why the T.R.O. should not be converted into a preliminary injunction.

At the hearing the next day the court was operating under the assumption that the EPA Administrator's order cited by plaintiffs in their complaint was valid in its entirety and that the only question to be resolved was whether defendants were going to comply with that order. Accordingly, the court permitted plaintiffs to present testimonial and documentary evidence on this point. That evidence tended to support plaintiffs' claim that, given the physical nature of the lands about to be sprayed and given the mechanical features of aerial application of pesticides, it would be impossible for Georgia to aerially apply Mirex to plaintiffs' lands without violating the EPA Administrator's order. Defendants had been unable, on such short notice, to round up all the witnesses they

needed, and the court decided to let the T.R.O. stand and have a second hearing on September 8.

After the September 5 hearing ended, the court had its first opportunity to examine FIFRA. As explained in Environmental Defense Fund, Inc. v. Hardin, 138 U.S.App.D.C. 391, 428 F.2d 1093, 1095 (1970), FIFRA, which is now administered by the EPA, regulates the shipment in interstate commerce of pesticides. FIFRA does not, at this time, regulate the *use* to which properly registered pesticides may be put by public officials or private individuals. FIFRA requires that pesticides and other products defined as "economic poisons" carry labels bearing certain information, including any warnings or cautionary statements necessary to prevent injury to the public. A pesticide which fails to comply with the labeling requirement or which cannot be rendered safe by any labeling, is considered "misbranded", and the Administrator of the EPA must refuse or cancel its registration as an "economic poison" approved for shipment in interstate commerce. The interstate distribution of an "economic poison" that is unregistered, "misbranded", or otherwise out of compliance with the statute is a misdemeanor, and the offending items are subject to confiscation.

The statute establishes an elaborate procedure by which a registration may be canceled, and the procedure begins when the Administrator of the EPA issues a notice of cancellation to a registrant. Upon the receipt of such a notice, the registrant may request the appointment of a special advisory committee to study the matter. After the committee completes its study and submits its report and recommendations, the Administrator must make a determination. The registrant may then file objections and request a public hearing, after which the Administrator must make a new determination. Any person who will be adversely affected by the Administrator's final order may obtain judicial review in the appropriate United States

Court of Appeals. A special expedited procedure is available to the Administrator of the EPA in emergency situations.

In the present case, the Administrator of the EPA, on March 18, 1971, issued a notice of cancellation of Allied Chemical Company's ten registrations of pesticides containing Mirex. The grounds for the cancellation were that evidence from laboratory experiments raised serious questions about the safety of continued use of pesticides containing Mirex. The cancellation was based on the EPA's conclusion that continued registration of these pesticides was contrary to certain provisions of FIFRA, specifically 7 U. S.C. § 135(z)(2)(c), (d), and (g) (1970).[3] Allied Chemical chose to challenge the cancellation order and requested the appointment of a special scientific advisory committee to consider the matter. The advisory committee reported back to the Administrator on March 1, 1972 and made detailed findings and recommendations. Principally, the committee found that Mirex presented grave hazards to the aquatic environment. The committee recommended that (1) Mirex registrations should be continued with labeling restrictions to minimize environmental contaminations, that (2) publicly supported control programs be limited to infested areas, that (3) where publicly supported programs were unavailable "nonaerial broadcast" treatment by individuals, rather than mound-to-mound treatment, be recommended, and that (4) more information and (5) more research be obtained.

The Administrator adopted the findings of the committee but went further than the recommendations of the committee, and he also affirmed the cancel-lation of Allied Chemical's registrations with the proviso that they would be reinstated if Allied amended its labels in accordance with the Administrator's directions. The key elements of his determination were:

"As a result of the potential threat to the aquatic environment posed by Mirex, I am naturally reluctant to permit distribution of Mirex bait in a manner that might contaminate estuaries, lakes, and streams. Those who are familiar with aerial application techniques believe that it is practical, by the use of proper cutoff mechanisms and guidance systems in the aircraft, to avoid contamination of streams and lakes in upland areas where such aquatic environments cover a rather small proportion of the land. Judicious use of aerial application is preferable to hand distribution of bait, which often results in over-treating obvious mounds but missing inapparent young colonies with a resultant rapid reinfestation.

"At the same time, maximum caution must be exercised to prevent damage to the aquatic environment. All broadcast application, aerial or otherwise, must be prohibited in coastal counties or parishes and on or near rivers, streams, lakes, ponds, and other aquatic areas. I also believe it necessary to restrict aerial or other broadcast application in non-coastal, nonaquatic areas to Federal, State, county, or local authorities. Thus, I depart from the recommendation of the Advisory Committee that nonaerial broadcast treatment by individuals be authorized where publicly supported control programs are unavailable.

---

3. 7 U.S.C. § 135(z): "The term 'misbranded' shall apply—* * *

  (2) to any economic poison—* * *

  (c) if the labeling accompanying it does not contain directions for use which are necessary and if complied with adequate for the protection of the public;

  (d) if the label does not contain a warning or caution statement which may be necessary and if complied with adequate to prevent injury to living man and other vertebrate animals, vegetation, and useful invertebrate animals;
* * *

  (g) if in the case of an insecticide, nematocide, fungicide, or herbicide when used as directed or in accordance with commonly recognized practice it shall be injurious to living man or other vertebrate animals, or vegetation, except weeds, to which it is applied, or to the person applying such economic poison . . . . ."

All broadcast treatment by private individuals must be prohibited.

\* \* \* \* \* \*

"For the foregoing reasons, the cancellation of Allied Chemical's registrations is affirmed, but the registrations will be reinstated upon submission by Allied Chemical, and acceptance by the Agency, of amended labeling which conforms to the conditions set forth in this decision . . . ." 37 Fed.Reg. 10987, 10988 (1972).

The determination was made May 3, 1971 and entered May 4, 1971. It is clear that the Administrator recognized that his authority went only as far as the labeling requirements. The second paragraph of that portion of the decision quoted above must be taken to refer to the directions the Administrator wanted placed on the labels of the Mirex containers.

Subsequently, Allied Chemical presented amended labels for the registrations canceled by the May 3rd order and the Pesticides Regulation Division of the EPA accepted them. On June 30, 1972, the Administrator approved the amended labels and determined that Allied's registrations would be reinstated because:

"Those amended labels conform to the conditions set forth in the May 3 Determination and Order. Thus, as I stated in that order, I am herewith determining to reinstate those registrations." 37 Fed.Reg. 13299, 13300 (1972).

The Administrator also stayed the effect of the May 3 order through the fall 1972 spraying season for product #218–586 which was to be used in Hawaii to control the mealy-bug wilt. The reason for the stay was that the program had already been incorporated in the growers' plans there.

In addition to making a new determination on June 30, the Administrator entered an "order." The first sentence of that "order" prohibits "all application, aerial or otherwise, of Mirex pesticides . . . in or near estuaries, rivers, streams, lakes, swamps, ponds, other aquatic areas, and heavily forested areas." But a later portion of the "order" provides that:

"The amended labeling submitted by Allied Chemical for its registered Mirex pesticides conforms to the conditions set forth in the May 3 Determination and Order, and I accept such labeling as being in conformity therewith. Therefore, all of Allied Chemical Corp.'s registrations of Mirex pesticides, with the new labels, are reinstated." 37 Fed.Reg. at 13300.

Thus the result of the June 30 order by the Administrator was that Allied's Mirex was no longer "misbranded" and could be shipped and distributed in interstate commerce. The first sentence of that "order" must be read as a suggestion by the Administrator to public officials and private individuals who use Mirex since FIFRA does not now authorize the Administrator to regulate the use to which properly registered pesticides are put by public or private persons.

On the basis of the court's understanding of FIFRA, counsel for plaintiffs and counsel for defendant Irvin were summoned to chambers and asked if they had understood FIFRA the same way the night the T.R.O. was signed. Counsel for plaintiffs responded affirmatively but conceded that the complaint had not artfully expressed this understanding, if it expressed it at all. Counsel for plaintiffs also conceded that under the current version of FIFRA the Administrator of the EPA has no authority to control the use to which properly registered pesticides are put by either public or private persons. Nevertheless, counsel for plaintiffs contended that Secretary Butz could not, with impunity, finance and support a pest control program which would involve an open violation of a determination reached by the Administrator of the EPA, and counsel requested the opportunity to file an amended complaint and supplemental brief. The court granted the request.

Counsel for defendant Irvin took that opportunity to inform the court that Congress is now considering legislation to amend FIFRA and authorize the Administrator of the EPA to regulate the *use* of pesticides. The United States House of Representatives has already passed a bill to accomplish this called the Federal Environmental Pesticide Control Act of 1971, H.R. 10729, 92d Cong., 1st Sess. (1971). Different forms of H.R. 10729 were approved by the United States Senate Committee on Agriculture and Forestry and by the Senate Committee on Commerce in June 1972 and it appears those committees are in the process of resolving their differences on the bill. When the Senate Subcommittee on Agricultural Research and General Legislation considered H.R. 10729, David D. Dominick, Assistant Administrator for Categorical Programs, Environmental Protection Agency, gave a statement which said in part:

"The two keys to the present statute [FIFRA] are the labeling-registering requirements, which is the basic scheme for registration, and the interstate requirement. FIFRA applies only to pesticides shipped in interstate commerce. The FIFRA primarily authorizes the regulation of pesticide in interstate commerce through federal registration requirements which include regulation of labeling and content.

\*   \*   \*   \*   \*   \*

"*The defect in the labeling approach to regulation is that it provides no direct authority to impose regulation on the use of a pesticide once the user buys it.*" (Emphasis added.) *Hearings on H.R. 10729 Before the Subcomm. on Agricultural Research and General Legislation of the Senate Comm. on Agriculture and Forestry,* 92d Cong., 2d Sess., pt. 2, at 87 (1972).

In its report on H.R. 10729, the Senate Committee on Commerce stated, under the general category entitled "Summary of the Legislation," the following:

". . . [FIFRA] does not prohibit the misuse of a pesticide nor does it regulate pesticides moving solely in intrastate commerce." S. Rep. No. 92–970, 92d Cong. 2d Sess., at 8 (1972).

Plaintiffs' amended complaint and supplementary brief, filed this morning, merely restate the contentions made by plaintiffs' counsel in chambers. They again concede that FIFRA does not authorize the EPA Administrator to control the use of properly registered pesticides, but insist that Secretary Butz must see to it that federal funds and support are not given to programs designed to control pests by the use of Mirex if such use will be in disregard of the directions on the Mirex containers and in violation of the EPA Administrator's orders. They say that Mirex cannot be aerially administered in Georgia without involving non-compliance with the directions on the Mirex containers and the Administrator's orders and that this court should therefore enjoin the aerial application of Mirex in Georgia.

■   The legal issues in this case may be resolved on the basis of what is already before the court. First, as to jurisdiction, the court does not believe that the shipment in interstate commerce by the Department of Agriculture of properly registered Mirex is "final agency action" reviewable under the Administrative Procedure Act. Nevertheless jurisdiction over the subject matter of this case appears to be vested in this court by 28 U.S.C. § 1361, Peoples v. United States Dept. of Agriculture, 138 U.S.App.D.C. 291, 427 F.2d 561 (1970), and the court will so assume without expressly so deciding.

Next, as to standing, it is clear that the named landowner plaintiffs have standing to sue. Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). It is less clear that SAVE,

INC. has such standing.[4] But since the outcome of this case will be the same whether SAVE, INC., has standing or not, the court will bypass that issue, particularly since all the parties have not had an opportunity to brief it.

On the merits the court concludes that the temporary restraining order must be dissolved. As plaintiffs recognize, FIFRA grants no authority to the EPA Administrator to issue an "order" regulating the use to which Mirex or any other pesticide which is properly registered may be put by public officials or private individuals, and that includes the Secretary of the United States Department of Agriculture and the Commissioner of the Georgia Department of Agriculture. Accordingly, that portion of the Administrator's "order" of June 30, 1972 which states, "All applications, aerial or otherwise, of Mirex pesticides is prohibited on or near estuaries, rivers, streams, lakes, swamps, ponds, other aquatic areas, and heavily forested areas," must be considered advice to the public much the same as the notice required by federal law on cigarette packages, "Warning: The Surgeon General has Determined that Cigarette Smoking is Dangerous to Your Health", is advice. There is simply no statutory duty imposed upon defendants or anyone else to follow the directions on Mirex and other pesticides and no matter which statute plaintiffs allege for jurisdiction this court cannot enjoin defendants from doing something that is not illegal. As the court has already noted, the EPA itself is aware of this gaping hole in FIFRA and it has sought, and may soon get, statutory authority to control the use of properly registered pesticides. If and when such authority is granted by Congress, these defendants and everyone else will be duty-bound to comply with any valid regulations or orders issued by the EPA concerning use of pesticides. But no such authority has been granted yet.

This is not to say that defendants are flouting the Administrator's "Determination and Order" of June 30, 1972. The director of Georgia's program to control the imported fire ant testified at the first hearing that Georgia has made every effort to use Mirex as directed by the labels on the containers and as indicated by the Administrator.

■ The United States Department of Agriculture, by the same token, has prepared a detailed Environmental Impact Statement on the application of Mirex to the environment, and that Statement has withstood legal attack for its sufficiency. Environmental Defense Fund v. Hardin, 325 F.Supp. 1401 (D. D.C.1971). In addition, the Department is currently engaged in a continuing and comprehensive monitoring program cov-

---

4. In paragraph 5 of the complaint plaintiffs allege that:

"Plaintiff Save America's Vital Environment, Inc. (SAVE), is a non-profit, public-benefit membership corporation organized and operating under the laws of the State of Georgia, having its principal place of business at 881 West Conway Drive, Atlanta, Georgia. Among the purposes of SAVE are to protect, preserve and enhance the natural environment of the United States, and of Georgia in particular. The members of SAVE are primarily professional people with various specialities [sic] ; i. e., land-use planners, architects, engineers, lawyers, scientists, transportation specialists, etc. SAVE attempts to utilize the expertise of its members to achieve environmental protection through enactment of legislation, court action and other legal action, and by encouraging and promoting citizen action. Members of SAVE have devoted much time and expertise to environmental protection in Georgia, and to the Pine Mountain Area (Harris County) in particular. Its members, for example, have filed suit to prevent the State and Federal governments from constructing Federal Interstate Route I–185 through Pine Mountain; they have conducted scientific work upon the mountain; they frequently visit Callaway Gardens and Franklin D. Roosevelt State Park, and they enjoy many other activities, both professional and recreational, that will be affected if Defendants are permitted to conduct the aerial application of Mirex described below."

The court questions whether this satisfies the *Sierra Club* test in view of the fact that no mention is made of the particular land about to be sprayed.

**528**

ering all pesticides, including Mirex. *See* 37 Fed.Reg. at 13300.[5]

In sum, defendants have not and will not violate any duty imposed upon them by FIFRA in the conduct of the planned program to aerially apply Mirex to plaintiffs' lands in order to control the imported fire ant.

Since plaintiffs have made no showing that the bodies of water contained in the lands in question are navigable, no relief may be granted under 33 U.S.C. §§ 407, 466 et seq., or 1151 et seq. That would leave only the contention that relief is appropriate under Ga.Code Ann. §§ 17–501 et seq., which is a matter for the state courts to consider.

For these reasons the temporary restraining order entered against defendants in this case is hereby dissolved and of force no longer.

It is so ordered.[6]

---

5. Technically, under 7 U.S.C. § 147a(a) the State of Georgia, not the United States Department of Agriculture, is responsible for the facilities and means used to carry out the aerial application program.

6. Counsel for defendant Butz have complained that they were never served with process in accordance with Rule 4, Fed. R.Civ.P., and that technically no judgment could be entered against him.

   The Clerk of the Court has informed the court that the proper forms for securing service by the United States marshal were not submitted by plaintiffs until this morning and that the proper number of service copies have never been submitted.

Plaintiffs are, of course, required by Rule 4(d), Fed.R.Civ.P., to supply the Clerk with the proper number of service copies, and they should do so immediately.

Nevertheless, under Rule 65, Fed.R.Civ. P., a temporary restraining order may be issued in some circumstances without any notice to the adverse party whatever, and a preliminary injunction may be issued if notice has been given to the adverse party. In the present case defendant Butz does not contend that he wasn't notified about the T.R.O. and the show cause order and he could have been preliminarily enjoined in this case even if he has not yet been formally served with process.