**CITIZENS FOR MASS TRANSIT AGAINST FREEWAYS et al., Plaintiffs,**

v.

**Claude S. BRINEGAR, Secretary of the Department of Transportation, et al., Defendants.**

**Civ. No. 71-636.**

United States District Court, D. Arizona.

April 5, 1973.

Gary Peter Klahr, Flynn, Kimerer, Thinnes & Galbraith, Gerald F. Moore, Phoenix, Ariz., for plaintiffs.

Richard F. Burke, U. S. Atty., Moise Berger, Maricopa County Atty., Gary K. Nelson, Atty. Gen., Snell & Wilmer, Phoenix, Ariz., for intervenor Litchfield Park.

Joe R. Purcell, Phoenix City Atty., Stanley Z. Goodfarb and E. Dennis Siler, Asst. Atty. Gen., Phoenix, Ariz., for Ariz. Highway Dept. and Ariz. Highway Commission.

## OPINION and ORDER

MUECKE, District Judge.

This is a suit to enjoin completion of a freeway. Plaintiff, Citizens for Mass Transit Against Freeways (CMTAF), is a non-profit unincorporated association with members residing exclusively in the greater metropolitan Phoenix area. Other specifically named plaintiffs have property along the proposed route of the freeway. Defendant Brinegar is the Secretary of Transportation. The Arizona Highway Department and Arizona Highway Commission, Maricopa County, the City of Phoenix, and Litchfield Park Properties were granted leave to intervene as defendants.

Standing of plaintiffs was challenged in several motions to dismiss, and on September 6, 1972 plaintiffs were given leave to file their Fifth Amended Complaint. Cross motions for summary judgment were filed with a stipulated statement of facts. Based on a review of these motions and statement, this Court finds that there is no genuine issue as to any material fact. Thus, summary judgment is appropriate pursuant to Fed.R.Civ.Proc. 56.

Plaintiffs seek to enjoin further action on several sections of freeway in various stages of development. Generally, the freeway is to be an extension of Interstate Highway 10 which is to run from Los Angeles, California through Phoenix, Arizona to the east. For the purposes of explanation and clarity, the portions of freeway concerned here have been divided into six sections.[1] Pertinent facts and contentions of the parties regarding each section will be dealt with in turn.

## SECTION I, BRENDA, ARIZONA TO TONOPAH, ARIZONA

The Brenda to Tonopah section is generally the westerly most portion of the proposed freeway for which construction has not been fully completed. Brenda is approximately 110 miles and Tonopah about 50 miles west of Phoenix. Construction on portions of Section I were commenced in 1963. To date, some $21,000,000 has been expended by defendants for purchase of right of way and construction of some 63.6 miles of grade and drain facilities. Surfacing and signing contracts are under way; the probable total investment for this section will exceed $40,000,000.

[1]

Sections of the freeway are as indicated:

(NOT TO SCALE)

It has been agreed by the parties that no Environmental Impact Statement (EIS) was prepared for this section of highway because construction between Brenda and Tonopah had commenced prior to the passage of the National Environmental Policy Act of 1969 (NEPA), Pub.L. 91–190, 83 Stat. 852, 42 U.S.C.A. 4321 et seq. (1970). Thus, information regarding it has been provided by the parties only for consideration relative to other sections involved.

## SECTION II, TONOPAH TO PERRY-VILLE ROAD

Section II covers an approximate 29 miles of highway running generally through desert land from Tonopah on the west to Perryville Road on the east. Oglesby Road divides this section about 19 miles east of Tonopah. The Arizona Highway Department has completed acquiring rights of way from Tonopah to Oglesby Road, and nearly one half of the right of way has been acquired from Oglesby Road to Perryville Road. Right of way purchases and preparation of construction plans and preliminary engineering has cost approximately $975,000 to date, and the total projected cost for this section is approximately $12,500,-000.

A draft EIS on this section was prepared by the Arizona Highway Department in April 1971. This statement was then circulated among several county, state, and federal agencies and comments received were made a part of the final statement submitted on June 15, 1971. Administrative approval of this statement was given by appropriate federal agencies on July 16, 1971.

Since the original EIS has been prepared pursuant to Federal Highway Administrative regulations and Department of Transportation Order 5610.1 dated October 7, 1970, when the Fifth Amended Complaint in this case was filed on September 5, 1972, a draft supplement to the EIS was prepared by the Arizona Highway Department. This supplement purports to comply with the Department of Transportation PPM 90–1 (1971) which provides administrative guidelines for implementation of Section 102(2)(C) of NEPA, 42 U.S.C.A. § 4332(2)(C). The supplement was circulated for comment among some twenty-three federal, state, and local governmental and private agencies, and additional comments were received from six other groups or agencies. All these comments, including at least one by the chairman of plaintiff CMTAF, were included in the final supplement to the EIS. This supplement was approved by the Secretary of Transportation on February 14, 1973.

At least three public hearings were conducted regarding this section of highway. One hearing was held in Phoenix on February 24 and 25, 1960, and covered location of the highway from Brenda to Phoenix on what is now the alignment from Brenda to Oglesby Road. On May 8, 1965, a second hearing was conducted concerning relocation of the alignment of Interstate 10 from Oglesby Road through Perryville Road to Interstate 17 (also called the Black Canyon Highway which is the boundary between Sections IV and V). For both of these hearings PPM 20–8 (June 15, 1959) was in effect and provided administrative guidelines for implementing 23 U.S.C. § 128 (1958). The relevance of this PPM and statute is that they required reasonable advanced notice of a scheduled hearing which was to consider the economic effects of the location of any federal highway running through a city.

On June 17, 1970, a third public hearing was held to consider the design features of Interstate 10 from Tonopah (in Section I) to 67th Avenue in Phoenix (the boundary between Sections III & IV). This hearing was conducted pursuant to PPM 20–8 (Jan. 1969) which was an implementation of 23 U.S.C.A. § 128 as amended Aug. 23, 1968. In particular this PPM differs from the 1959 PPM in that it requires a separate design and location hearing and it requires consideration not only of economic but also of the social and environmental impact of a highway on the community.

Plaintiffs' first contention, which is also their primary contention regarding other sections of this freeway, is that the

impact statements filed are not sufficiently detailed within the meaning of Section 102(2)(C) of NEPA and PPM 90–1.[2] Specific lack of detail is attributed, for example, to failure of the statement to include a discussion of the implication of a redistribution of population, to the unavoidable adverse effects of the proposed construction such as air pollution, and the alternatives to the proposed realignment. It is noted, however, that these contentions are made regarding the original EIS, and no specific contentions are made regarding the lack of sufficient detail for the final Supplement EIS. Defendants assert in refutation to plaintiffs' contentions that the original EIS was completed properly under existing guidelines since it was circulated before June 30, 1971 when PPM 90–1 (1971) took effect. See 36 Fed.Reg. 7724 (April 23, 1971).

■■ There is no question but that an environmental impact statement for this section of highway is required even though Interstate 10 was a program initiated prior to January 1, 1970 when NEPA became effective. Lathan v. Volpe, 455 F.2d 1111, 1121 (9th Cir. 1971). Furthermore, there is no question that this Court may not substitute its judgment for that of the Secretary in determining the necessity or desirability of a particular project. Jicarilla Apache Tribe of Indians v. Morton, 471 F.2d 1275 (9th Cir. 1973). The court's function is limited to determining whether the Secretary's action followed the necessary procedural requirements. *Jicarilla, supra*; Conservation Council v. Froehlke, 340 F.Supp. 222 (M.D.N.C.1972).

■ Applying these principles, this Court finds that there has been no violation of Section 102(2)(C) of NEPA for this section of highway. There has been no specific allegation of a deficiency for the final Supplement to the EIS which was approved by the Secretary of Transportation on February 14, 1973. Whether the specific deficiencies alleged by plaintiffs for the original EIS in fact cause an insufficiency of detail for that statement need not be decided. That question is moot by reason of the supplemental statement, and therefore this Court holds that no violation of NEPA has occurred pertaining to Interstate Highway 10 from Tonopah to Perryville Road.

Plaintiffs' second contention regarding Section II is that the hearings conducted in 1960 and 1965 were defective in at

2. In pertinent part, 42 U.S.C.A. § 4332 provides:
§ 4332. *Cooperation of agencies; reports; availability of information; recommendations; international and national coordination of efforts*
The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall—
\* \* \* \* \*
"(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—
(i) the environmental impact of the proposed action,
(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
(iii) alternatives to the proposed action,
(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.
Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes;"

least two respects. First, plaintiffs assert that the 1965 hearings should be reconsidered in light of 23 U.S.C.A. § 128 (1968) and PPM 20–8 (1969) to include discussion of the social impact of the highway. Second, plaintiffs assert that there was a procedural deficiency in the 1965 hearings in that appropriate notice was not published thirty days prior to the date of the hearings, as is required by PPM 20–8 (1969). Defendants assert that hearings were properly conducted under then existing PPM 20–8 (1959) and that in any event plaintiffs are estopped by laches to now contest any deficiency in the hearings.

■ Plaintiffs' contentions are without merit. Even accepting their theory that the spirit of environmental protection contained in NEPA should be applied to other federal legislation, no authority is offered which requires retroactive application of the hearing procedures in 23 U.S.C.A. § 128 (1968) and PPM 20–8 (1969). Furthermore, this Court finds that there was no procedural deficiency in the 1965 hearings in that "reasonable advanced notice" of the hearing was given pursuant to PPM 20–8 (1959), para. 5(b). Agreed facts demonstrate that official notice was published nineteen days prior to the hearing and that the hearing was attended by nearly 200 persons. Certainly nineteen days is reasonable notice under the circumstances of this case. Finally, even if procedural directives were held to be retroactive and advanced notice was found to be unreasonable, this Court concludes that as a matter of law plaintiffs are estopped by laches to assert invalidity of the 1960 and 1965 hearings by a complaint filed at least five years after the hearings occurred. Lathan v. Volpe, *supra,* 455 F.2d at 1122. The facts clearly show that further hearings were conducted, such as the 1970 hearing, and that there was a large expenditure of public funds due at least in part to reliance on the alignment discussed at the 1960 and 1965 hearings. Thus, for the foregoing reasons, this Court holds that there has been no deficiency in the conduct of either the 1960 or 1965 hearings which may be asserted to affect this portion of the highway.

### SECTION III, PERRYVILLE TO 67th AVENUE, PHOENIX

Section III of the freeway runs generally in an easterly direction and covers some fifteen miles from Perryville Road, which is outside the city limits, to 67th Avenue, Phoenix. Construction is scheduled to begin in 1973 with a total projected cost of some $36,000,000. The original EIS was prepared pursuant to the interim guidelines mentioned in Section II, and this EIS was approved by appropriate federal agencies on July 16, 1971. After filing of the complaint in this action, a supplement to the original EIS was prepared pursuant to PPM 90–1, and it was circulated beginning September 18, 1972. Comments by some thirty-five federal, state, and local agencies were included in the final supplement submitted to the Federal Highway Administration. Final approval of this supplemental EIS was given by the Secretary of Transportation on December 8, 1972.

■ Plaintiffs' contention that the original EIS was insufficient in detail is mooted by the subsequent approval by the Secretary of the supplemental EIS. From the many comments attached to the supplemental EIS, it is clear that there has been full disclosure of relevant social, economic, and environmental factors pertaining to the freeway so that the Secretary could arrive at an informed decision on whether to construct this portion of freeway. See also, Jicarilla Apache Tribe of Indians v. Morton, *supra*; E. D. F. v. Corps of Engineers, 325 F.Supp. 749 (E.D.Ark.1971); Conservation Council v. Froehlke, *supra.* No issue on procedural compliance with NEPA remains for consideration, Lathan v. Volpe, *supra,* and so this Court holds that there has been no violation of NEPA for Section III of Interstate 10.

Plaintiffs' contention that there were procedural deficiencies in the 1965 hearing that applied to this section of high-

way as well as to the section from Tonopah to Perryville Road were disposed of under the discussion in Section II and need not be reconsidered here.

### SECTION IV, 67TH AVENUE TO INTERSTATE HIGHWAY 17 (BLACK CANYON FREEWAY)

This section of Interstate 10 runs easterly for about six miles from 67th Avenue to the intersection with Interstate Highway 17, which runs generally north to south at the point of intersection. Including the portion of Sections II and III from Oglesby Road eastward to the intersection with Interstate 17, the Arizona Highway Department has spent some $7,160,000 of a projected $15,000,000 for right of way acquisition and relocation payments. Approximately eighty percent of the parcels for this section have been purchased, and another $1,800,000 has been expended or contracted out for preliminary engineering and surveying. The total projected cost for Section IV is $80,000,000.

Environmental study for this Section also includes information relative to Section V of the freeway. Prior to January 23, 1969 when a location and design public hearing was had, NEPA had not been enacted and so there was no requirement for an environmental impact statement as such. However, a four-volume feasibility study was conducted by a consulting engineering firm and it considered various social, economic, and environmental aspects of the proposed highway. Several location and design approvals have been given by the Federal Highway Administration between the date of the public hearing in May 1965 and the effective date of NEPA.[3]

In January 1972, after enactment of NEPA and upon filing of the complaint in this action, the Arizona Highway Department began preparation of a draft EIS pursuant to PPM 90–1. This draft statement was submitted for circulation in June 1972, and comments from some seventy-six federal, state, and local agencies and individuals were received and included in the final EIS which was filed with the Federal Highway Administration on January 8, 1973. Included as a part of the comments were statements by various named plaintiffs in this action. This EIS received regional approval by the Federal Highway Administration on January 22, 1973.

Again, plaintiffs' primary contention is that the draft EIS, which has now received regional approval by the Federal Highway Administration, is insufficiently detailed within the meaning of Section 102(2)(C) of NEPA and PPM 90–1. They further assert, however, that since the EIS has not received final approval by the Secretary of Transportation further action on this Section of Interstate 10 should be stopped immediately. Defendants argue that the draft supplement to the EIS reflects compliance with NEPA. Also, say defendants, further action should not be halted since they have made substantial effort to comply with NEPA requirements.

Plaintiffs' factual contentions in support of the alleged insufficiency of the EIS filed in January 1973 are contained in numerous affidavits filed with this Court. It is noteworthy, however, that these same affidavits are by and large appended as comments to the EIS submitted to the Federal Highway Administration on January 8, 1973. These

3. In general, federal law establishes five stages in the construction of a federally financed highway. First there is the "program" stage where the state desiring financial assistance submits to the Secretary a program of proposed projects for utilization of proposed projects. Next come the "routing" and "engineering design" stages at which time survey, plans, specifications, and estimates for proposed projects are submitted to the Secretary for approval and hearings are conducted pursuant to PPM 20–8. Location approval comes during the routing stage, and design approval comes in the engineering design stage. "Right-of-way acquisition" comes after the engineering design and it is at this stage that the government may become contractually obligated to participate in acquisitions. Finally, "construction" is begun after federal authorization by the division engineer. See Lathan v. Volpe, 455 F.2d 1111 (9th Cir. 1971).

comments have been responded to by defendants. Furthermore, no assertion is made by plaintiffs either that there has been arbitrary or capricious compliance by administrative agencies preparing this EIS or that there has been any procedural deficiency other than the alleged insufficiency of detail. Plaintiffs misjudge the role of this Court if they assume that is its function to examine each argument advanced for or against construction of the proposed highway. Jicarilla Apache Tribe v. Morton, *supra*. This Court is convinced that the three-volume EIS submitted in January 1973 is sufficient to fully disclose adverse positions on the impact of the freeway to the appropriate federal agency. E. D. F. v. Corps of Engineers, *supra*; Conservation Council v. Froehlke, *supra*. Thus, presuming that the statement is ultimately approved by the Secretary, there would be no violation of NEPA for this section of highway.

This, however, does not dispose of plaintiffs' argument that since there has been no final approval of this EIS that any further action on this portion of highway should end at this time. Plaintiffs place heavy reliance on Arlington Coalition Transportation v. Volpe, 458 F.2d 1323 (4th Cir. 1972) for the proposition that it is appropriate to halt construction of a highway before the freeway reaches a state of acquisition and construction that the costs of abandoning or altering the proposed route outweigh the benefits to be gained therefrom. Thus, plaintiffs argue that if the freeway is to be stopped it must be halted now before there is adverse impact on the environment and before the freeway reaches a state of acquisition and construction that equity would undoubtedly balance in favor of construction.

Defendants, in essence, argue that no injunction should issue since upon balance the harm to the public interest would be greater if injunction were to issue than if none were issued. See generally Aberdeen Railroad v. Scrap, 409 U.S. 1207, 93 S.Ct. 1, 34 L.Ed.2d 21

(1972); Sierra Club v. Hickel, 433 F.2d 24, 33 (9th Cir. 1971). In support of this position defendants point to the numerous systems, location, and design approvals given prior to the effective date of NEPA and to the millions of dollars that have been spent since 1965 by county and city governments for access roads in reliance on the expected route of the freeway. Furthermore, defendants argue that, considering the total investment to date with the increasing construction costs of seven to ten percent per year, any delay in action on the freeway would be detrimental to the public interest. Finally, defendants assert that since no construction is planned on this section for at least a year since they have been diligent in their efforts to comply with NEPA, no injunction should issue pending the final decision by the Secretary on the EIS already submitted.

This becomes a hair-splitting task involving an ongoing federal highway, but this Court is convinced in light of the considerations offered by both parties that for this section of freeway no injunction should issue. It is noted that Arlington Coalition Transportation v. Volpe, *supra*, is distinguished at least insofar as the posture of compliance with NEPA is concerned. Thus, considering the current posture of compliance, which undoubtedly means that any further federal action on this portion of freeway will consider environmental factors, this Court concludes that even the *Arlington* test favors issuing no injunction and furthermore that no practical purpose would be served by issuing such an injunction. Jicarilla Apache Tribe of Indians, *supra*.

SECTION V, INTERSTATE HIGHWAY 17 (BLACK CANYON FREEWAY) TO 32ND STREET—THE INNER LOOP

Section V covers about ten miles of Interstate 10 and runs easterly from the intersection with Interstate 17 to 32nd Street in Phoenix where an interchange is planned. Approximately eight blocks

west of this interchange at about 21st Place, the east-west alignment turns to a north-south alignment with portions of the highway extending both to the north and to the south of the east-west alignment. The north-south 21st Place alignment of the highway will run from its northerly most interchange with Thomas Road to its southerly most point where it will connect with an already existing portion of Interstate 10. Section V has been colloquialized as the Inner Loop since along with an already constructed portion of Interstates 10 and 17, it forms the northern and eastern portion of what is in effect a circumferential around the center of downtown Phoenix.

A large portion of work on Section V has already been completed. Some $27,-500,000 of a projected $40,600,000 has been expended for right of way and relocation payments. A total of 68.11 percent of the real property has been acquired and over 50 percent of the improvements have been cleared. By January 1, 1972, approximately $9,250,000 had been committed for contracts or spent on items such as consulting engineering, preliminary engineering, and surveying. Additionally, one three-fourth mile portion of the Inner Loop along the north-south alignment was constructed between 1963 and 1965 at a cost of $570,943.86. This portion of Section V is currently in use.

Berney Park, a public facility of the City of Phoenix, lies about one-fourth mile north of the northerly most completed portion of the 21st Place alignment. Location and design approvals were given for the routing through Berney Park on October 23, 1961 and July 2, 1962 respectively. Although construction on the portion of highway through Berney Park was not programmed until 1974, between 1965–67 the Arizona Highway Department acquired the fee interest to a 2.03 acre section of park and along the alignment. The total cost of this acquisition, which included relocation of a ball diamond facility, purchase of replacement lots for the City, and demolition of several dwellings, was

$122,345. For the approximate one mile section immediately adjacent to the park 91 percent of the land has been acquired at a cost of $1,433,601.

A public hearing was held to consider the location and design features of this portion of highway as well as a portion east of 32nd Street (Section VI) on January 23, 1969. Notice of this hearing was published in the Arizona Republic and in the Phoenix Gazette on December 31, 1968 and January 8, 1969. Other articles publicizing the hearings appeared in the Arizona Republic on December 9, 14, 21, and on January 9, 10, 13, and 19. Over 500 persons attended the hearing which considered among other articles publicizing the hearings ap- items a four-volume feasibility study prepared by a consulting engineering firm for portions of Sections IV and V. At the time of this hearing the Arizona Highway Department and Arizona Division of Federal Highway Administration were following PPM 20–8 (1959). In pertinent part, paragraph 4b of PPM 20–8 (1959) required reasonable advanced notice of hearing to be published at least once each week for two successive weeks in a newspaper of general circulation.

■ Plaintiffs' first contention that the EIS on this portion of highway is insufficient in detail has been considered herein under Section IV since Section V of this highway was the subject of the same four-volume feasibility study and supplemental EIS as Section IV. Furthermore, having considered all the action taken on Section V before enactment of NEPA and the stage of approval of the EIS submitted to the Secretary of Transportation of January 8, 1973 as well as other facts mentioned pertaining to Section IV, this Court holds that there has been no failure to comply with NEPA for which the equities would favor issuing any injunction.

■ Plaintiffs also contend, however, that injunction should issue by reason of defendants' alleged failure to comply with 23 U.S.C.A. § 138 (1968) and

49 U.S.C.A. § 1653(f) (1968) [referred to as a 4f statement] which are implemented by the Department of Transportation in PPM 90–1 and require consideration of alternatives and plans to minimize harm to any publicly owned parkland of local significance.[4] Defendants contend first that while there is no need to prepare a 4f statement since the portion of parkland on the interstate alignment was purchased from the City before enactment of 23 U.S.C.A. § 138 and 49 U.S.C.A. § 1653(f) and since it has been determined to be not a useable parkland of local significance[5] nevertheless there has been compliance with the 4f requirement in that the final EIS submitted on January 8, 1973 includes treatment of the statutory requirements. Defendants also contend that plaintiffs are somehow barred by laches from asserting noncompliance with the statutes since the right of way over Berney Park was acquired some five years ago.

The laches argument advanced by defendants need not be considered since this Court finds that the 4f considerations presented in the EIS submitted on January 8, 1973 are sufficient to fully disclose to the Secretary of Transportation the various alternatives to constructing the interstate next to Berney Park. This Court is not unmindful that the proposed alignment may be considered a "use" of Berney Park within the meaning of 23 U.S.C.A. § 138 even though the actual acreage over which the freeway will pass may be said no longer to be a park of local significance. Brooks v. Volpe, 460 F.2d 1193 (9th Cir. 1972). The fact that the remainder of Berney Park is immediately adjacent to the freeway route is enough to require a 4f statement *Id*. Furthermore, this Court is aware that the total absence of a 4f statement would be sufficient reason to halt any further action until compliance with the statute by defendants since there is still significant federal action to be taken. Arlington Coalition on Transportation v. Volpe, *supra*. See also Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Indeed, the failure to complete a 4f statement for Berney Park may well provide a basis to enjoin any further action at least on the Inner Loop. See Named Ind. Mem. of San Antonio Con. Soc. v. Texas Hy. Dept., 446 F.2d 1013 (5th Cir. 1971). While it is possible also that voluntary compliance with 23 U.S.C.A. § 138 itself may not be sufficient reason to deny granting an injunction, halting further action until a final determination by the Secretary of Transportation when already there has been approval by the Federal Highway Administration of the EIS which considered alternatives to the proposed alignment and plans to mini-

4. 23 U.S.C.A. § 138 provides:

"§ 138. *Preservation of parklands*

It is hereby declared to be the national policy that special effort should be made to preserve the natural beauty of the countryside and public park and recreation lands, wildlife and waterfowl refuges, and historic sites. The Secretary of Transportation shall cooperate and consult with the Secretaries of the Interior, Housing and Urban Development, and Agriculture, and with the States in developing transportation plans and programs that include measures to maintain or enhance the natural beauty of the lands traversed. After the effective date of the Federal-Aid Highway Act of 1968, the Secretary shall not approve any program or project which requires the use of any publicly owned land from a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance as determined by the Federal, State, or local officials having jurisdiction thereof, or any land from an historic site of national, State, or local significance as so determined by such officials unless (1) there is no feasible and prudent alternative to the use of such land, and (2) such program includes all possible planning to minimize harm to such park, recreational area, wildlife and waterfowl refuge, or historic site resulting from such use."

5. A determination was made on May 16, 1972 by the Parks and Recreation Board of the City of Phoenix that the portion of Berney Park purchased by AHD is not a park of local significance; this would appear, therefore, to remove this section of park for 4f consideration. See 23 U.S.C.A. § 138, 49 U.S.C.A. § 1653(f).

mize harm to the parks, certainly would serve no practical purpose. See *Jicarilla Apache Tribe of Indians, supra*. Furthermore, this Court is not convinced by any argument offered by defendants that a decision by the Secretary on future federal action would be meaningless in the absence of issuing an injunction at this time. See Arlington Coalition on Transportation v. Volpe, *supra*. The Secretary has 4f information before him to be considered before any actual construction is approved. Of course, upon the abuse of discretion by the Secretary the plaintiffs may have other grounds upon which to seek injunction. In its current posture, however, this Court holds that no violation of 28 U.S.C.A. § 138 has been shown which at this time would allow granting the relief sought by plaintiffs.

Finally, plaintiffs seem to contend that the hearing of January 23, 1969 was improperly conducted since official notice was not given at least once each week for the two successive weeks prior to the hearing, paragraph 4b PPM 20–8 (1959), and since no separate "design" and "corridor" hearings were held pursuant to paragraph 6A of PPM 20–8 (1969). Defendants refute plaintiffs' contention by arguing first that since the effective date of PPM 20–8 (1969) was six days after the 1969 hearings were conducted there was no violation of either notice or subject matter requirements of the PPM. Defendants further assert that the 1969 hearing complied with 23 U.S.C.A. § 128 as amended in 1968, which was implemented by the PPM, since social, economic, and environmental considerations of both design and corridor were considered.

▆▆ Plaintiffs' argument that since PPM 20–8 is dated January 14, 1969 it should have controlled the January 23, 1969 hearing is refuted by the fact that the effective date of the PPM is January 29, 1969. Concerned Citizens of Marlboro v. Volpe, 459 F.2d 332 (3rd Cir. 1972); Pennsylvania Environmental Council v. Bartlett, 454 F.2d 613 (3rd Cir. 1971). This Court holds further that any failure to officially notice the hearing for two successive weeks prior to the hearing is insubstantial error in view of the many newspaper articles published prior to the hearing and in view of the large attendance of persons at the hearing. See Nashville I–40 Steering Committee v. Ellington, 387 F.2d 179 (6th Cir. 1967), cert. denied 390 U.S. 921 (1968). These facts combined with the uncontested affidavit showing that the administrator of the hearing had no knowledge of the new PPM when the hearing was conducted and the lack of any showing by defendants of how the effective version of the PPM was substantially violated, and the unrefuted affidavit indicating compliance with the substance of 28 U.S.C.A. § 128 (1968) leads to the conclusion that no further hearings should be required. See Citizens to Preserve Foster Park v. Volpe, 3 E.R.C. 1031 (D.Ind.1971), aff'd 466 F.2d 991 (7th Cir. 1972); Township of Hopewell v. Volpe, 446 F.2d 167 (3rd Cir. 1971); Elliott v. Volpe, 328 F.Supp. 831 (D.Mass.1971).

### SECTION VI. 32ND STREET AND EASTWARD

This final section of proposed freeway is a part of the state primary system and is not essential to the usability of Interstate 10. This proposed highway would run east from the 32nd Street interchange with Interstate 10, have various outlets to streets in Phoenix and Scottsdale, and finally connect with the Indian Bend Freeway running to the northeast out of Tempe. Tempe lies to the southeast of Phoenix and to the south of Scottsdale.

▆▆ The only federal action with regard to this Section was the granting of systems approval in August 1962. No federal funds have been approved for this project, and construction is at least six to ten years away. The original proposed route for this highway goes through Papago Park, a large city facility on the edge of Phoenix. The Arizona Highway Department (AHD) is now examining nine possible route lo-

cation alternatives all passing near or going through Papago Park. Furthermore, from 1965 to 1971 AHD purchased fourteen parcels of land along the proposed primary route at the request of the owners by reason of hardship. A total of 38.68 acres were obtained at a cost of $760,465. Furthermore, some $29,501 was expended in relocation assistance pursuant to Appendix B, PPM 20–8 (1969).[6] AHD's present plans regarding the highway east of 32nd Street are to request federal location approval after completing the route alternative study, preparing an environmental and 4f statement pursuant to PPM 90–1, and having a location hearing pursuant to PPM 20–8.

This identical section of highway was the subject of another action in this Court entitled Boren, et al., v. Volpe, et al., CIV 72–508 PHX–CAM. After argument on September 27, 1972 in the Boren case, this Court denied plaintiffs' motion for a preliminary injunction and ordered that defendants furnish in writing to those plaintiffs any impending federal action. Subsequent to entry of that order, defendants moved for summary judgment.

In the *Boren* case, as in the instant one, plaintiffs seek to enjoin any action by AHD, including any further property acquisition, until compliance with appropriate environmental laws. The distinction between *Boren* and this case is that in *Boren* plaintiffs assert failure to comply with NEPA, 42 U.S.C.A. § 4332, while in this case they assert that the failure to complete the 4f statement required by 49 U.S.C.A. § 1653(f) and 23 U.S.C.A. § 138 provides the ground for issuing an injunction. Plaintiffs in both cases argue that the system approval of August 1962, hearings conducted in 1969 which did consider to some degree location and design of the highway east of 32nd Street, and the fact that AHD acquisitions were made pursuant to Secretary of Transportation PPM 20–8 (1969) show that there is major federal action within the meaning of NEPA which would allow enjoining further action. Lathan v. Volpe, 455 F. 2d 1111 (9th Cir. 1971). Plaintiffs also argue that a 4f statement should be prepared before any further action since all the proposed routes go through or near Papago Park and that any additional property acquisitions would render federal approval of the route a fait accompli. Defendants dispute that there has been major federal action within the meaning of NEPA since there has not yet been location approval for the proposed route. Boston v. Volpe, 464 F.2d 254 (1st Cir. 1972). Also, they contend that preparation of a 4f statement would be premature before selection of a route since the impact of any route on Papago Park could not be determined until after route selection.

This Court is convinced that the most appropriate way to proceed in this action is to issue no injunction but to retain jurisdiction and require defendants to

---

6. IM 20–1–69 (April 8, 1969) (Appendix B, PPM 20–8) provides in pertinent part: "Paragraph 10e of PPM 20–8, dated January 14, 1969, provides that the division engineer may authorize the acquisition of right-of-way before a design hearing under criteria to be promulgated by the Federal Highway Administrator. The criteria to be followed are as follows:

\* \* \* \* \*

3. *Protective Buying.* Whole and partial takings may be made subsequent to the corridor hearing and approval of the location by the division engineer in those instances where it is demonstrated to the satisfaction of the division engineer that such action is necessary in the public interest to (a) forestall proposed commercial and residential development which would utilize the proposed highway right-of-way or adversely affect the highway design or (b) result in a substantial dollar savings in the cost of right-of-way acquisition over that which would have been incurred had the right-of-way been acquired at a later date.

4. *Hardship Cases.* Whole takes may be made following the corridor public hearing and the division engineer's approval of the highway location where it is demonstrated that the property owner would suffer undue hardship if acquisition were deferred until after the design public hearing."

keep plaintiffs informed of any impending federal action. This case is distinguishable from Lathan v. Volpe, *supra,* in the important respect that here there has been no federal approval for acquisition of housing. Furthermore, there is no allegation that the AHD has embarked on a program to acquire parcels along the proposed route in derogation of federal law, and there is no allegation that further acquisitions are planned. These facts, combined with the absence of location approval by the federal government for this section of highway, leads this Court to conclude that there has been no major federal action or approval which would require issuing injunction at this time. It is ordered, however, that defendants keep plaintiffs informed of impending action and that plaintiffs be allowed to renew their complaint should there be further developments to suggest a violation of either PPM 90–1 or PPM 20–8.

## REMAINING CONSIDERATIONS

There are two remaining considerations, each having application to more than one Section of the proposed freeway. First, plaintiffs contend that defendants have violated Section 143 of the Federal Aid Highway Act of 1962, 23 U.S.C.A. § 134 (amended 1970), which requires transportation planning in certain urban areas. Plaintiffs allege that defendants have not prepared a mass transit plan for the Phoenix metropolitan area either in an environmental impact statement or otherwise. Defendants argue in refutation that PPM 50–9 (1969), which implements 23 U.S.C.A. § 134, requires only that a transportation planning process be carried out continuously and that the facts demonstrate that this has been done.

Stipulated facts show that in excess of ninety studies have been made since 1944 regarding transportation needs in Phoenix. These studies have been completed by various state and local agencies. Plaintiffs themselves acknowledge that mass transit has been considered

for the Phoenix area and rejected as unusable.

■ Specifically, plaintiffs seem only to assert that somehow NEPA was violated by defendants since the environmental impact statements filed for the sections of highway going through urban Phoenix did not include mass transit planning allegedly as required by 23 U.S.C.A. § 134. Plaintiffs' only authority for their position, however, is D. C. Federation of Civic Associations v. Volpe, 140 U.S.App.D.C. 162, 434 F.2d 436, 439 (1970). This case, however, only stands for the proposition that the Secretary of Transportation must satisfy all requirements of Title 23, including 23 U.S.C.A. § 134, before constructing any interstate routes in the District of Columbia pursuant to Section 23 of the Federal Aid Highway Act of 1968. No argument is made in the case at hand to suggest that the Secretary has failed to consider any of the mass transit plans agreed to have been completed; indeed a discussion of mass transit is included in the EIS submitted on January 8, 1973. No case authority is offered which requires the Secretary to consider mass transit as a part of a particular EIS and this Court has not been directed to any requirements of NEPA or PPM 90–1 which themselves specifically require including in an environmental impact statement the plan required by 23 U.S.C.A. § 134. As defendants point out, PPM 50–9 (1969) does not require a specific finding regarding mass transit for a specific road but only that it be considered in long range highway planning. Citizens to Preserve Foster Park v. Volpe, *supra.* Thus, plaintiffs' argument must be rejected by reason of their failure to offer any argument in law or in fact to support their apparent position that mass transit planning must be included in an environmental impact statement.

The final contention advanced by plaintiffs which bears mention and which applies generally to all sections of highway in issue is that there has been a failure to comply with paragraph 6,

PPM 90–1 in that the submitted environmental impact statements are a result of piecemealing.[7] Defendants argue that there has been no violation of the PPM in that submitted environmental impact statements cover highway sections of substantial length between logical termini for sections to be constructed on a multi-year improvement plan as required by the PPM.

In fact, only three environmental impact statements have been filed for the six sections of highway discussed herein. The first, from Tonopah to Perryville Road (Section II) covered at least twenty-nine miles over generally vacant desert land. The second, from Perryville Road to 67th Avenue (Section III), covers approximately fifteen miles of highway through generally agricultural land. And the third, from 67th Avenue to 32nd Street (Sections IV and V), covers about sixteen miles through urbanized Phoenix.

Plaintiffs place heavy reliance on Named Ind. Mem. of San Antonio Con. Soc. v. Texas Hy. Dept., 446 F.2d 1013 (5th Cir. 1971) for the proposition that the Secretary may not divide a project into sections for the purpose of complying with PPM 90–1. It should be noted that *San Antonio* dealt with dividing into sections what apparently had always been considered one project so that approval might be obtained to proceed with action on two end segments of highway without completing a 4f statement which was required for the middle segment. The middle segment contained a park.

No such division of segments is apparent in the instant case, however. Taken to extremes the logic of what plaintiffs assert would be to require approval of an entire freeway system before any action could be begun. This simply is not required by the statute. Also, in the case at hand there is no allegation that the Secretary has acted in a clandestine manner to avoid statutory requirements as was suggested in *San Antonio*. Sections covered by each EIS appear reasonable. Indeed, the third environmental impact statement covers a section of highway in which there is a park which could logically have been covered in more than one statement of a project of substantial length. Thus, this Court holds that there has been no showing of piecemealing to support a violation of PPM 90–1 that would justify granting plaintiffs the relief requested.

Therefore, it is ordered that plaintiffs' motion for summary judgment is denied and defendants' motion for summary judgment is granted as consistent herewith.

---

7. PPM 90–1 (1971) provides in pertinent part:
   "6. PROCEDURES (See Appendixes C and D for a flow chart)
   The highway section included in an environmental statement should be as long as practicable to permit consideration of environmental matters on a broad scope. Piecemealing proposed highway improvements in separate environmental statements should be avoided. If possible, the highway section should be of substantial length that would normally be included in a multi-year highway improvement program."